# WADE v. CHICAGO, SPRINGFIELD AND ST. LOUIS RAILROAD COMPANY.

# AMERICAN LOAN AND TRUST COMPANY v. WADE.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF ILLINOIS.

Nos. 247, 248. Submitted April 21, 1893. — Decided May 10, 1893.

The " after-acquired property " clause in a railroad mortgage covers not only legal acquisitions, but also all equitable rights and interests subsequently acquired either by or for the railroad company, the mortgagor.

Where negotiable paper has been put in circulation, and there is no infirmity or defence between the antecedent parties thereto, a purchaser of such securities is entitled to recover thereon, as against the maker, the whole amount, irrespective of what he may have paid therefor.

A railroad company contracted with a construction company to build and complete its railroad on a line designated on a map of the same, and to furnish and equip it, agreeing to pay for the same in stock and mortgage bonds, to be issued from time to time as sections should be completed. A mortgage was made of the road and property then existing and afterwards to be acquired. The construction company began work and completed a small section, for which it received the stipulated pay in stock and bonds. It parted with the latter for a good consideration, and they eventually came by purchase into the possession of W. No further section was completed, but work was done at various points on the line, and the construction company acquired for the railroad company rights of way through nearly or quite the entire route. Subsequently another railroad company acquired these properties through the construction company, and completed the road. *Held*, that W., being a *bona fide* holder of the bonds secured by the first mortgage, who had purchased the bonds in good faith, had through the mortgage a prior lien on the whole line

for the full amount of the face of his bonds, which was not affected by the fact that the new company acquired its rights and property, not directly from the first company, but through intervening conveyances.

THE case is stated in the opinion.

*Mr. Frederick N. Judson, Mr. Charles S. Taussig* and *Mr. Samuel P. Wheeler* for Wade and Hopkins, Trustees, appellants in No. 247 and appellees in No. 248.

*Mr. Adrian H. Joline* for Pratt, Trustee, the Mercantile Trust Company and the Central Trust Company, appellees in No. 247; and for Pratt, Trustee, appellant in No. 248.

MR. JUSTICE JACKSON delivered the opinion of the court.

The appellants, Belle N. B. Wade and Warner M. Hopkins, testamentary trustees of the estate of Robert B. Wade, as holders of fifty first-mortgage bonds of the Chicago, Springfield and St. Louis Railroad Company, on January 27, 1887, filed their bill in the United States Circuit Court for the Southern District of Illinois, for the purpose of enforcing a mortgage lien upon the property and railway of said company, extending from Springfield, Illinois, to East St. Louis, Illinois. The material facts of the case, as set out in the bill and as disclosed by the record, are as follows:

The Chicago, Springfield and St. Louis Railroad Company was incorporated January 17, 1883, under the general laws of Illinois, to build and operate a proposed line of railroad from Springfield to East St. Louis in that State. After surveying the route and designating the same on a map filed in the office of the company, and after securing certain rights of way on the line of the road, on March 3, 1883, it entered into a contract with the Empire Construction Company, of which one Wing was president and sole stockholder, to build, finish, and equip the proposed railway of the Chicago, Springfield and St. Louis Railroad Company within a stipulated time. The contract provided as follows:

" These articles of agreement made and entered into this

third day of March A. D. 1883, by and between the Empire Construction Company, a corporation of the State of Illinois, party of the first part, and the Chicago, Springfield and St. Louis Railroad Company, a railroad corporation of the same State, party of the second part, witnesseth:

"That for and in consideration of the covenants and payments hereinafter recited to be made by said party of the second part, said party of the first part, hereby for itself, its successors and assigns, covenants and agrees to furnish all the material and labor necessary to construct, iron, bridge, and complete the railroad of said party of the second part, as now surveyed and designated on a map filed in the office of the party of the second part, which railroad commences at a point on the Gilman and Clinton branch of the Illinois Central Railroad at the city of Springfield, and extends by way of Litchfield and Mount Olive to the bridge junction at East St. Louis, Illinois, a distance of about ninety-eight (98) miles, passing through the towns of Pawnee, Litchfield, Mount Olive, Alhambra, Marine, Troy, and Collinsville, with four and one-half (4½) miles of side track, (necessary to the places marked on said map for the business of the line at the time of the opening,) and to furnish the said railroad with depots, water tanks, and turn-tables, and to equip the same with engines and cars as hereinafter provided.

"The road and side tracks hereby agreed to be constructed are those on said map marked and specified only, and said map is hereby referred to for further particulars in this behalf; and the said road and side tracks are to be built in manner and according to the specifications and conditions following; and the bridges, depots, water tanks, turn-tables, engines, and cars are to be those only also hereinafter mentioned in the specifications."

Certain specifications were made a part of the contract, but they need not be recited.

In consideration of the premises and of the undertakings of the construction company thus set forth, the railroad company agreed to pay therefor, in its negotiable bonds to be issued thereafter, the amount of $2,500,000, and $990,000 of its

capital stock fully paid and non-assessable. The bonds were to be secured by a trust deed or mortgage in proper form and duly executed by the company upon all its property, real or personal, owned by it or afterwards acquired, including its franchises of every kind. The construction company, its successors or assigns, were to receive from the trustee twenty-five bonds to the amount of $25,000, and eighty shares of capital stock of the value of $8000, as each mile of the road was constructed and completed, and on the chief engineer's certificate obtained therefor.

The contract further provided that the construction company, its successors or assigns, for the purpose of construction, should have the right to the full and free possession, use, and control of said railway, equipment, and property of the railroad company, as constructed, made or furnished under the agreement, or otherwise obtained, together with the right to use and operate said railway in the name of the railroad company under its franchises necessary thereto, for the transportation of persons and property, until the final and ultimate completion and acceptance of said railroad, without charge therefor by the railroad company, and also at its own cost keep said railroad in good repair and condition, ordinary wear and tear excepted.

The contract further provided that if at any time a change of the route of the said road was necessary to be made, it was agreed that the same might be done on certificate of the chief engineer and approval of the president of the construction company, and thereupon all of the terms and conditions of the contract as to said modified route were to be the same as agreed in respect to the route then specified on the map.

In pursuance of this contract, and under proper authority of law, by vote of the stockholders of the railroad company, its board of directors was authorized to issue bonds of the company in the sum of $2,500,000, to pay for the building of the road, and to execute to the Central Trust Company of New York a mortgage upon all the properties and franchises, which were particularly described in the mortgage, as follows:

"All and singular the several pieces or parcels of land

forming the track or roadway of said railroad company from a point on the Gilman and Clinton branch of the Illinois Central railway at the city of Springfield and extending by way of Litchfield and Mt. Olive to the bridge junction at East St. Louis, Illinois, a distance of about ninety-eight miles, passing through the towns of Crow's Mills, Pawnee, White Oak, Litchfield, Mt. Olive, Alhambra, Nervine, Troy, and Collinsville, and being in or through the counties of Sangamon, Montgomery, Macoupin, Madison, and St. Clair, whether the same is now acquired and owned by said railroad company or may be hereafter acquired and owned by said company; also the railroad of said party of the first part and any and all its branches thereof, and any and all switches and turnouts thereof, together with all the rails, bridges, depots, stations, station-houses, section-houses, fences, and other structures and appurtenances thereto belonging now owned by said railroad company, or that may hereafter be constructed, completed, finished, acquired, or owned by said company; also, all the tolls, income, issues, and profits and alienable franchises of said party of the first part, connected with its railroad or relating thereto, including its rights and franchises as a corporation; and also, all and singular the property of every kind hereinafter mentioned, whether now owned or that may hereafter be acquired and owned by said railroad company, that is to say, all the rolling stock of every description, all the machine shops, car shops, and blacksmith shops, all the machinery, stationary engines, and all articles used in the construction, replacing, and repairing thereof, together with all the tools and materials, and any and all other property now owned or hereafter to be acquired by said party of the first part."

This mortgage was duly executed and properly recorded near that date in the several counties through which the railroad was located and was to be constructed. The bonds secured thereby were 2500 in number, of the denomination of $1000 each, redeemable in gold May 1, 1913, with interest-bearing coupons attached, payable semiannually at the American Exchange National Bank, New York. These bonds

were delivered to the trustee, to be by it delivered to the construction company in amounts of $25,000, on the certificate of the engineer of the railroad company as each mile of the road was completed, under and in accordance with the terms of the contract of the construction company with the railroad company. And in addition to the bonds to be thus delivered eighty shares of non-assessable stock of the railroad company, at the par value of $8000, were to be delivered to the construction company upon the same conditions.

The construction company under, and in pursuance of, this contract commenced the construction of the railroad, and in July, or early in August, 1883, had completed two miles of the road, and thereafter, in October, 1883, received from the Central Trust Company, upon certificate of the chief engineer of that fact, fifty of the mortgage bonds.

These bonds, so received by the construction company, were deposited on November 5, 1883, by Wing, the representative of said company, with a trustee as collateral security to secure the payment of the sum of $35,000, evidenced by the note of said Wing, and endorsed by Robert B. Wade for the accommodation of Wing and the said construction company. By the terms of the pledge of these bonds the trustee was authorized, upon the failure of Wing or the construction company, to pay said note at maturity, to sell said bonds, which sale it was agreed might be made without notice to Wing or to the construction company, and by express terms Wade was to have the same power or privilege of purchasing at said sale as any other person. Demand was made upon Wing at the maturity of the note to pay the same, which he failed to do, and thereupon the trustee holding the collateral, on due notice of time, place, and terms of sale, sold the bonds. They were purchased by the testamentary trustees of Wade, he having died in the meantime, for the sum of $20,000, which amount was credited upon a judgment on the note, previously confessed by Wing, and the balance of the indebtedness was subsequently collected by process of law. Under this purchase the appellants became the holders of the bonds.

These bonds, amounting to $50,000, were all that were ever

actually issued under the above-described mortgage of the Chicago, Springfield and St. Louis Railroad Company, for while the construction company graded considerable portions of the road, and acquired for the railroad company rights of way throughout a large part, if not the entire route, it failed to complete any other mile or miles of the road so as to become entitled to additional bonds.

In April, 1885, the railroad company becoming satisfied that the construction company was unable to execute its contract, or would fail to perform the same, the stockholders authorized its board of directors to "make such arrangements with said company or other parties as will secure the construction of this road and preserve the rights of all parties interested, and that they be authorized to modify or change said contract or make a new contract with the Empire Construction Company if they think necessary to secure the building of this road, maintaining the legal rights of all parties concerned, and upon the surrender of all outstanding bonds said directors may satisfy the present mortgage, and issue new bonds and secure same by mortgage on the property and franchises of this road."

Acting under this authority the railroad company on April 29, 1885, entered into a new contract with the construction company, which need not, however, be specially noticed, as it was vacated and cancelled on May 23, 1885, in compliance with the request of said construction company.

Wing, who was the chief promoter of the Chicago, Springfield and St. Louis Railroad Company, and the sole stockholder and owner of the Empire Construction Company, after suspending operations under the contract of the latter with the railroad company, organized and caused to be incorporated on May 19, 1885, the St. Louis and Chicago Railway Company. This company was incorporated to construct a railroad from Litchfield to Springfield in Illinois on the line of the Chicago, Springfield and St. Louis Railroad Company, and on May 26, 1885, a few days after the organization of the new company and after the construction company had been released from its contract with the Chicago, Springfield and St. Louis Railroad

Company, the said construction company by Wing, as its president, conveyed and transferred to H. H. Cooley & Company, a firm composed of a brother and a brother-in-law of Wing, for the consideration of $142,015.11 the following-described property: All right of way acquired by the Empire Construction Company for the Chicago, Springfield and St. Louis Railroad Company between Litchfield, Illinois, and Springfield, Illinois, estimated, as per voucher, to be of the value of $4785.40; all cross-ties between Litchfield and Springfield, Illinois, on the side (site) of survey made for the Chicago, Springfield and St. Louis Railroad Company, estimated, per voucher, to be of the value of $2546; all embankments, excavations, trestle-work, tiling, and all other work done in the building and construction of a railroad on the line of survey between Litchfield and Springfield, Illinois, done and constructed by the Empire Construction Company, estimated, per voucher, to be of the value of $72,134.22; all contracts for right of way guaranteed the Empire Construction Company for the Chicago-Springfield Railroad Company, estimated, per voucher, at the sum of $19,000; all right of way contracted for the Chicago, Springfield and St. Louis Railroad Company by the Empire Construction Company, estimated, per voucher, at the sum of $12,000; all right of way in Litchfield acquired by the Empire Construction Company for the right of way for the Chicago, Springfield and St. Louis Railroad Company, estimated to be of the value of $10,000; all engineering services and engineering in tile construction, location, surveys, estimates, and superintendence of construction in the work done between Litchfield and Springfield, Illinois, estimated, as per voucher, at $4672.93; all estimates, rights, and advantages accrued to the Empire Construction Company by reason of any contract heretofore existing, and all rights in the Empire Construction Company resulting from work done, material furnished, money expended, and included in the term "miscellaneous," as per vouchers, $16,876.56; all surveys, contracts, profiles, books, and all property belonging to the Empire Construction Company, except that of like nature as above enumerated, on the line of the Chicago, Springfield and St.

Louis Railroad Company south of the line of the Indianapolis and St. Louis Railroad Company.

This conveyance was duly recorded in Montgomery County, Illinois, May 27, 1885. On the same day the above conveyance was executed, H. H. Cooley & Company, by deed, duly recorded in Montgomery County, Illinois, transferred the same property to the St. Louis and Chicago Railway Company in consideration of one dollar, and of a contract entered into that day by H. H. Cooley & Company with the St. Louis and Chicago Railway Company to build a line of railroad north from Litchfield to Springfield, a distance of about forty-five miles. This road was completed in 1886 on the same line substantially as that surveyed for the Chicago, Springfield and St. Louis Railroad Company, and described in the conveyance of the Empire Construction Company to H. H. Cooley & Company. The St. Louis and Chicago Railway Company, on July 1, 1885, executed a mortgage to the Mercantile Trust Company of New York to secure an issue of its bonds to the amount of $500,000, which bonds were put in circulation and are outstanding. The mortgage securing the bonds was duly recorded in each of the counties through which the said railroad extended.

It further appears from the record, and the findings of fact in the decree of the court below, that, on June 12, 1886, the Empire Construction Company conveyed to the said firm of H. H. Cooley & Company, for the express consideration of $5000, all the real estate and personal property, rights, and easements acquired by said construction company for the Chicago, Springfield and St. Louis Railroad Company *south* of the Indianapolis and St. Louis Railway, and between Litchfield and Alhambra, Illinois, over the line surveyed, and on the rights of way acquired, for the Chicago, Springfield and St. Louis Railroad Company, together with all embankments, excavations, trestle-work, and all other work done in the building and construction of a railroad on the line of said Chicago, Springfield and St. Louis Railroad Company *south* of Litchfield; and on the same date, June 12, 1886, the firm of Cooley & Company, for the express consideration of $75,000, conveyed

the same property and rights to the Litchfield and St. Louis Railway Company, which the said Wing and associates also organized and incorporated, under the laws of Illinois, for the purpose of completing the road of the Chicago, Springfield and St. Louis Railroad Company between Litchfield and East St. Louis. This line was constructed between Litchfield and Mount Olive, a distance of about ten miles, but the new corporation appropriated the rights acquired for the Chicago, Springfield and St. Louis Railroad Company between Litchfield and Alhambra. The Litchfield and St. Louis Railway Company executed a mortgage to the Central Trust Company of New York for the purpose of securing $200,000 of bonds. It is claimed by the complainants that this mortgage was cancelled and discharged, but that does not distinctly appear from the record, and is not deemed material in the view we take of the case.

The Central Trust Company, as trustee of the mortgage of the Chicago, Springfield and St. Louis Railroad Company, executed in 1883, and also as trustee of the mortgage of the Litchfield and St. Louis Railway Company, executed in 1886, when applied to by the complainants, declined to institute foreclosure proceedings upon the first mortgage, and thereupon the complainants filed their bill making the three above-described railroad companies and the trustees of the mortgages executed by them, respectively, defendants to the bill. The complainants claim that, under the foregoing facts, the fifty bonds held by them are a lien upon the entire line originally surveyed, and partially constructed, for the Chicago, Springfield and St. Louis Railroad Company, by whom said bonds were issued, and that said company had made default in the payment of the same, and the interest coupons thereto attached, which matured May 1, 1884, and all interest coupons maturing since that date.

The bill was answered by the three railroad companies, viz., the Chicago, Springfield and St. Louis Railroad Company, the St. Louis and Chicago Railway Company, and the Litchfield and St. Louis Railway Company. Each of the companies admitted in its separate answer the execution of the various

mortgages ; that complainants were the holders of the fifty mortgage bonds issued by the Chicago, Springfield and St. Louis Railroad Company ; that said company had made default in the payment of the bonds and coupons as stated in the bill; and that said railroad company was insolvent ; but they each denied that any of the insolvent company's property was in the possession of the other defendants.

The Central Trust Company, in its answer, admitted that the complainants had applied to it to file a bill to foreclose the mortgage made by the Chicago, Springfield and St. Louis Railroad Company, and that it had refused to do so, and declared its purpose of resigning its trusteeship under both of the mortgages aforesaid; that before the actual commencement of this suit it resigned its trusteeship under each of these mortgages, and that the reasons for so doing were that it was advised by counsel that, owing to its trust relation to holders of bonds secured by each mortgage, it ought not to take part on behalf of one or the other in any controversy between such bondholders; and that the rights of the complainants could be fully protected in any suit or suits brought by said complainants in their own names.

The answer of the Mercantile Trust Company admitted the execution of the mortgage to it of the St. Louis and Chicago Railway Company, but denied that it accepted the trust therein with notice and subject to the prior rights of the complainants as holders of the fifty bonds of the Chicago, Springfield and St. Louis Railroad Company ; and as to other allegations of the bill it answered that it had no knowledge or information.

Proofs were taken upon the issues thus made, and the court below, on August 5, 1889, rendered its decision in the premises, dismissing the bill as to the St. Louis and Chicago Railway Company, and its trustee, the Mercantile Trust Company, and ordered and adjudged that the defendant, the Chicago, Springfield and St. Louis Railroad Company, or some one in its behalf, pay to the complainants, within ninety days, the sum of $22,976.59, being the said sum of $20,000 for which said bonds were bid off by complainants, and six per cent interest thereon

until paid, with costs of the suit to be taxed; and that in default of said payment all the right, title, interest, and equity of redemption of said Chicago, Springfield and St. Louis Railroad Company, and of the Litchfield and St. Louis Railway Company, and the St. Louis and Chicago Railway Company, in and to that portion of the property described in said mortgage, and lying south of the Indianapolis and St. Louis railroad, originally surveyed and laid out for the Chicago, Springfield and St. Louis Railroad Company, (which is specially described,) be sold by a special master without any equity of redemption, and that out of the proceeds of said sales, after the payment of costs and expenses attending the execution of the decree, the complainants be paid the amount decreed, with interest thereon at the rate of six per cent from the date of the decree.

After this decree was passed, the American Loan and Trust Company made application to intervene in the case as a trustee under a mortgage made April 1, 1887, by the St. Louis and Chicago Railway Company to secure bonds to the amount of $1,100,000, which the intervenor claimed was a lien on that portion of the railroad line and property *south* of Litchfield, on which the decision of the court below had awarded a lien to the complainants. This application of the American Loan and Trust Company was allowed, and by order of the court it was "made a defendant to this cause, with all rights of exceptions, appeal and the prosecution of writs of error, the said American Loan and Trust Company hereby entering its appearance and adopting and accepting the answer of the defendant, the Chicago, Springfield and St. Louis Railroad Company, as its answer herein, and agreeing that the replication to said answer heretofore filed shall stand as the replication to said answer as adopted by said American Loan and Trust Company, and it being further provided that this order shall not make it necessary to retake any of the evidence in this cause or to set aside any interlocutory proceedings or orders heretofore had or entered therein."

It appears from the proof that pending complainants' suit

the St. Louis and Chicago Railway Company had, in some way, acquired or been consolidated with the Litchfield and St. Louis Railway Company, and that the mortgage to the American Loan and Trust Company covered the whole line, both north and south of Litchfield.

The complainants appeal from so much of the decree of the Circuit Court as denied them a recovery upon the entire issue of bonds held by them — $50,000 and interest — and in denying them a prior lien upon the entire line of railroad, described in the bill as extending from Springfield to East St. Louis; and the American Loan and Trust Company appeal from so much of the decree as awarded complainants a lien for $22,976.59 on the Litchfield and St. Louis branch of the road, lying south of Litchfield. These constitute, in substance, the errors assigned by the respective appellants. The corporate existence of the American Loan and Trust Company having terminated during the pendency of these appeals, Dallas B. Pratt was substituted as trustee, and, by order of this court, has become a party to the record in place of his predecessor in the trust.

The testimony clearly establishes that the completed road *south* of Litchfield to Mount Olive was the same road surveyed, located and mapped for the Chicago, Springfield and St. Louis Railroad Company, which was located over the right of way acquired partly by the railroad company and partly by the construction company, under contract, for the railroad company. The court below found, as the proof clearly establishes, that "the Litchfield and St. Louis Railway Company took possession of the said uncompleted line of railroad and mingled other work and material therewith, and, upon a survey made and in accordance with plats and profiles thereto made for the Chicago, Springfield and St. Louis Railroad Company, did complete a line of railroad from Litchfield to Mount Olive, Illinois, and did also appropriate the rights acquired by and for the Chicago, Springfield and St. Louis Railroad Company between Mount Olive and Alhambra, Illinois."

It is further established by the proof that the defendant, the St. Louis and Chicago Railway Company, built and constructed

its road a distance of about eighteen miles on that portion of the line of the Chicago, Springfield and St. Louis railroad *north* of Litchfield, on the surveyed route and located line, and upon rights of way which had been theretofore acquired by and for the latter road. The rest of the line of the St. Louis and Chicago railway to Springfield, while slightly divergent from the line of the Chicago, Springfield and St. Louis railroad, was substantially the same, so that there is no practical difference between those portions of the line, either north or south of Litchfield.

It is further clearly established by the recitals in the conveyances made by the Empire Construction Company to H. H. Cooley & Company, and from said firm to the St. Louis and Chicago Railway Company, and to the Litchfield and St. Louis Railway Company — all of which conveyances were duly recorded — that the newly-organized railway companies, and their mortgagees were affected with full notice of the rights, properties, and interests which the Chicago, Springfield and St. Louis Railroad Company had in, to, and over the lines of road which the newly-organized roads completed under their contracts with Cooley & Company, as the successors or assignees of the Empire Construction Company.

It is clear, therefore, that the St. Louis and Chicago Railway Company and the Litchfield and St. Louis Railway Company must be held to occupy, in respect to the complainants, the same position which H. H. Cooley & Company and the Empire Construction Company would have occupied if the roads in question had been completed by either of them without the organization or incorporation of the two railroad companies which now claim and assert title to said lines of railway. Being charged with full notice and knowledge of the fact that the lines which they were completing belonged to the Chicago, Springfield and St. Louis Railroad Company, and with the further notice that that company had issued and put in circulation for value $50,000 in bonds, secured by its mortgage of 1883, they must be held to have acquired and to hold their rights in said lines in subordination to the rights of complainants. It may be true that all the rights of way, ease-

ments, embankments, and appurtenances which the Empire
Construction Company acquired for the Chicago, Springfield
and St. Louis Railroad Company under the contract between
those parties did not invest that railroad company with a per-
fect legal title thereto; but it cannot be questioned that all
the rights thus acquired conferred upon or gave to the Chicago,
Springfield and St. Louis Railroad Company an equitable title
and interest therein which would be covered by the "after-
acquired clause" of its mortgage, and that the construction
company had no right to transfer such interests over to third
parties, especially as against the bonds in question, which the
railroad company had issued for value, and the construction
company had put in circulation.

The "after-acquired clause" in the mortgage of the Chicago,
Springfield and St. Louis Railroad Company, under the de-
cisions of this court, covers all acquisitions made to that prop-
erty by either the construction company or others acquiring
rights under it. *Dunham* v. *Cincinnati, Peru &c. Railway
Co.*, 1 Wall. 254; *Galveston Railroad* v. *Cowdrey*, 11 Wall.
459; *Porter* v. *Bessemer Steel Co.*, 122 U. S. 267; *Toledo &c.
Railroad* v. *Hamilton*, 134 U. S. 296; *Central Trust Co.* v.
*Kneeland*, 138 U. S. 414. In this latter case it was held that
the "after-acquired property clause" of a mortgage will cover
not only legal acquisitions, but all equitable rights and inter-
ests subsequently acquired by or for the mortgagor.

If the two newly-organized corporations, which have appro-
priated the line of road, rights of way, and easements of the
Chicago, Springfield and St. Louis Railroad Company, had
taken their transfers directly from the latter, it would admit
of no question that the lien of complainants' bonds would ex-
tend over the whole line; and this result is not, and cannot
be, changed by the fact that they have acquired their rights
through the intervention and conveyances of the Empire Con-
struction Company to Cooley & Company, and by that firm to
the newly-organized companies, as those conveyances, together
with the mortgage of the Chicago, Springfield and St. Louis
Railroad Company, put them in full notice of the rights of the
latter company, and also of the rights of its mortgagee. *Joy*
v. *St. Louis*, 138 U. S. 1.

It cannot be assumed, therefore, that the St. Louis and Ch .go and the Litchfield and St. Louis Railway Companies, or their mortgagees, are such *bona fide* transferees or pur-chasers for value of the partially constructed Chicago, Spring-field and St. Louis railroad as to cut off the rights of bondholders secured by the prior mortgage of the latter company. Their acquisitions of the rights and interests of the Chicago, Springfield and St. Louis Railroad Company have in no way displaced the lien of complainants' mortgage, which had previously attached, not only to all of said partially constructed road, but to all accessions which might be made thereto, either by the mortgagor or others succeeding to its rights.

Under the facts in this case the newly-organized railway companies are in legal effect the successors of the Chicago, Springfield and St. Louis Railroad Company *cum onere*, and the mortgage lien held by the complainants upon the fran-chises and all property acquired in completing their mort-gagor's railroad between the original termini, whether by itself or its successors, remains in full force; it follows, there-fore, that the decree of the court below was erroneous in limiting the complainants to a lien on that portion of the road lying south of Litchfield, completed in the name of the Litch-field and St. Louis Railway Company. The same principles and consideration which entitle the complainants to a lien on that portion of the road lying south of Litchfield apply with equal force to the line lying north of Litchfield, and under the facts of the case, as already stated, they should have had their lien declared upon that portion of the railroad north as well as south of Litchfield. The complainants' lien has a clear and undoubted priority over the lien of the mortgage executed by the St. Louis and Chicago Railway Company to the American Loan and Trust Company on April 1, 1887, as that mortgage was executed *pendente lite* after the filing of complainants' bill herein.

The remaining question to be considered is whether com-plainants are entitled to a decree for the full amount of their bonds and interest, instead of the price they paid therefor

when the bonds were sold under pledge made by Wing, president of the construction company. The pleadings do not raise the question as to whether complainants were entitled to the full amount of their bonds. There was no issue presented on that question, and it was not proper, therefore, on the proof, even if the proof had warranted it, to have reduced the complainants' claim to the amount which they paid for the bonds when sold under the pledge thereof. The bonds were valid securities in the hands of the trustee for the protection of Wade as accommodation endorser for Wing, or the construction company, by whom they were pledged, and the pledgee or purchaser thereunder succeeded to the rights of the pledgor, and upon no principle could such purchaser, as against the maker, be restricted to what he might pay for the bonds. Negotiable securities once put in circulation for value may be transferred for less than their face, but the maker and those claiming under him cannot limit the right of a subsequent holder to a recovery of what he may have paid therefor.

In the case of *Cromwell* v. *County of Sac*, 96 U. S. 51, 60, in which it was held that the holder of such negotiable securities, regularly issued, is not limited to the amount which he may have paid therefor, it is said by the court, speaking by Mr. Justice Field: "We are of opinion that a purchaser of a negotiable security before maturity, in cases where he is not personally chargeable with fraud, is entitled to recover its full amount against its maker, though he may have paid less than its par value, whatever may have been its original infirmity. We are aware of numerous decisions in conflict with this view of the law; but we think the sounder rule, and one in consonance with the common understanding and usage of commerce, is that the purchaser, at whatever price, takes the benefit of the entire obligation of the maker. Public securities, and those of private corporations, are constantly fluctuating in price in the market, one day being above par and the next below it, and often passing within short periods from one-half of their nominal to their full value. Indeed, all sales of such securities are made with reference to prices current in the market, and not with reference to their

par value. It would introduce, therefore, inconceivable confusion if *bona fide* purchasers in the market were restricted in their claims upon such securities to the sums they had paid for them."

The same general principle is held in *Fowler* v. *Strickland*, 107 Mass. 552; *Moore* v. *Baird*, 30 Penn. St. 138; *Bange* v. *Flint*, 25 Wisconsin, 544; *Bank of Michigan* v. *Green*, 33 Iowa, 140; *Baily* v. *Smith*, 14 Ohio St. 396. By the decisive weight of authority in this country, where negotiable paper has been put in circulation, and there is no infirmity or defence between the antecedent parties thereto, a purchaser of such securities is entitled to recover thereon, as against the maker, the whole amount irrespective of what he may have paid therefor.

This was the position occupied by the complainants in respect to the bonds in question, which were regularly issued for value, and constituted *bona fide* debts against the mortgagor in the hands of Wade, or of the construction company before they were pledged. The testimony in respect to that pledge and the price at which the complainants purchased the bonds was objected to as incompetent, and it should have been excluded on two grounds: first, because there was nothing in the pleadings to warrant its introduction; and secondly, because nothing disclosed thereby authorized the scaling of the bonds, as was done by the decree. We are, therefore, of opinion that the decree was wrong in limiting complainants' right of recovery to the amount, and interest thereon, for which they purchased the bonds.

It is urged on behalf of Pratt that the principal of the bonds was not due; but in becoming a party to the cause the American Loan and Trust Company (to whose rights Pratt has succeeded) was required to adopt, and did adopt, the answer of the Chicago, Springfield and St. Louis Railroad Company, which admitted by its answer that it was in default in the payment of the bonds, and a similar admission was made by the St. Louis and Chicago Railway Company, under whose mortgage said trustee claims his rights were acquired. But aside from this, it is by no means certain, under the terms

of the Chicago, Springfield and St. Louis Railroad Company's mortgage, that the complainants did not have the right to foreclose, both for principal and for interest on their bonds.

This mortgage contained the provision " that upon default made in the payment of either interest or principal upon any one hundred of said bonds for the period of sixty days, then each and all of said bonds shall become absolutely due at the option of the majority in interest of the holders of said one hundred bonds in default; and upon decree rendered as aforesaid, judgment shall be made for the whole of said indebtedness thus due upon default of the part of said indebtedness as if all were absolutely due according to the terms of said bond." It was further provided that in the event of a sale the proceeds thereof, after defraying expenses incident thereto, should be applied in paying the several holders of the *then* outstanding bonds and coupons, secured by the mortgage, the amount of principal and interest, which might be due and unpaid, and in case of a deficiency in the fund to pay the same in full, then to distribute the fund *pro rata* among such holders. But the defendants having admitted that the bonds were in default, we do not feel disposed, in view of the fact that $50,000 constituted the entire issue, to reverse or modify the decree on the doubtful point as to whether the principal of the bonds under the terms of the mortgage could properly be treated as due.

Our conclusion is that there is no error in the decree of the Circuit Court of which the American Loan and Trust Company, or its successor, Pratt, can complain; and further, that the decree of the Circuit Court was erroneous in not allowing the complainants the full amount of their bonds, and in not declaring said bonds a lien upon the entire line of completed road from Springfield to Mount Olive.

*The decree is accordingly reversed in this respect, and the cause remanded to the Circuit Court with directions to enter a decree in conformity with this opinion, and it is accordingly so ordered.*

MR. JUSTICE FIELD did not sit in this case, and took no part in its decision.