THE CITIZENS SAVINGS & TRUST CO., TRUSTEE, *v.* THE
DAYTON TRACTION CO. ET AL.

*Mortgages—Railroads—After-acquired property included, when
—Consolidation of traction lines—Central power plant sub-
ject to lien, when.*

1. An after-acquired property clause in a railroad mortgage does
   not cover all property within the limits of the charter of
   the corporation where such property is not included within
   the express terms of the description in the mortgage itself,
   but covers only such property subsequently acquired by the
   mortgagor or its successor as comes within the description
   of the mortgage.

2. A central power plant erected by a consolidated traction cor-
   poration is subject to a lien of a mortgage given by one of
   the corporations before consolidation, where such mortgage
   covered a power plant maintained by the mortgagor com-
   pany but which was destroyed upon the completion of the
   central plant after consolidation, it being the statutory duty
   of the consolidated corporation to maintain the property for
   the purposes of the mortgage in as good condition as it was
   at the time it took possession of it.

(Decided April 22, 1921.)

APPEAL: Court of Appeals for Butler county.

*Messrs. Tolles, Hogsett, Ginn & Morley,* for The
Citizens Savings & Trust Company, plaintiff.

*Messrs. M. B. & H. H. Johnson,* for The Finance Company of Pennsylvania, defendant.

*Messrs. Ernst, Cassatt & Cottle,* for The Cincinnati, Dayton & Toledo Traction Company, defendant.

*Messrs. Harmon, Colston, Goldsmith & Hoadly* and *Mr. W. C. Shepherd,* for The Cincinnati & Dayton Traction Company, defendant.

*Messrs. Thompson, Hine & Flory* and *Messrs. Andrews & Andrews,* for The Cleveland Trust Company, defendant.

*Mr. John G. Price,* attorney general, and *Mr. E. E. Corn,* assistant attorney general, for the Public Utilities Commission.

CUSHING, J. This case was presented both on error and appeal. It will be considered on appeal.

Beginning in 1896 several interurban railroads were chartered and constructed between Cincinnati and Dayton. Each of these roads was complete in itself, consisting of a roadbed, power house, trolley and transmission poles and line, cars, equipment, and an earning capacity. Each road sold bonds and executed mortgages to secure their payment. Some years after these roads were completed they were consolidated. Then followed the purchase of a small steam road by individuals and a consolidation of the first consolidated roads with the steam road. The street railway of the city of Hamilton was then purchased, as was a road from Miamisburg to Germantown. The property was then leased to another company. That company assigned its lease. The lessee and its assignee constructed a central power house, with high-tension transmission lines, covering the entire road. The next step was

that the lessee forfeited the lease by default in its payments. The lessor defaulted in its payment of interest, and the road was sold in foreclosure proceeding.

This action is prosecuted to foreclose the liens of the underlying mortgages and for the adjustment of the equities between the various lienholders.

The corporations hereinafter referred to were organized under the Ohio laws.

The Dayton Traction Company was chartered to build and did build a road from Dayton to the south corporation line of Miamisburg. April 25, 1896, it gave a mortgage to the Finance Company of Pennsylvania to secure $250,000 of bonds.

The Cincinnati and Miami Valley Traction Company was chartered to build and did build a road from the south corporation line of Miamisburg to a point in the city of Hamilton. On November 30, 1896, it mortgaged its property to the Finance Company of Pennsylvania for $650,000.

The Cincinnati and Hamilton Electric Street Railway Company was chartered to build a road from Hamilton to Cincinnati. It constructed a road from Hamilton to North Bend road in College Hill, on the outskirts of the city of Cincinnati. July 1, 1898, it gave a mortgage to the American Trust Company for $400,000.

The Hamilton & Lindenwald Electric Transit Company owned and operated what was known as the city lines of Hamilton. In November, 1901, it mortgaged its road to The Cleveland Trust Company for $195,000.

Each of said roads was operated separately, and the mortgages contained a clause covering after-acquired property.

In 1900, The Dayton Traction Company, The Cincinnati & Miami Valley Traction Company, and The Cincinnati & Hamilton Electric Street Railway Company consolidated under the laws of Ohio, and formed the Southern Ohio Traction Company. That company on May 1, 1900, gave a mortgage on the consolidated property to the Cleveland Trust Company for $1,350,000. $650,000 of these bonds were given in exchange for the bonds of The Cincinnati & Miami Valley Traction Company. By this exchange the consolidated mortgage became the first lien on the Cincinnati & Miami Valley Traction Company's road, and a second mortgage on the property of the Cincinnati & Hamilton Electric Street Railway Company and the Dayton Traction Company.

In 1901 The Southern Ohio Traction Company purchased the property of the Miamisburg and Germantown Traction Company, a road eight and 48/100 miles long between Miamisburg and Germantown. In December of that year, it purchased, subject to its mortgage of $195,000, the Hamilton and Lindenwald Electric Transit Company railroad.

The Southern Ohio Traction Company next built an extension to the Cincinnati & Hamilton Electric Street Railway Company from North Bend road to the tracks of The Cincinnati & Northwestern Railroad Company, a steam road passing through College Hill. This extension was about one-half mile long.

The Cincinnati & Northwestern Railway Company was purchased by a number of men, who were either stockholders or directors in The Southern Ohio Traction Company. The road was improved and changed from a steam road to an electric line.

In March, 1902, The Cincinnati & Northwestern Railroad Company and The Southern Ohio Traction Company were consolidated and formed The Cincinnati, Dayton & Toledo Traction Company. That company, on July 1, 1902, gave a mortgage to The Cleveland Trust Company on its property to secure bonds in the sum of $2,700,000.

The Cincinnati, Dayton & Toledo Traction Company operated the road until May 1, 1905. At that time it leased the property to The Cincinnati Northern Traction Company. On February 1, 1908, that lease was assigned to The Ohio Electric Company. It operated the road until December, 1915, when it defaulted in its payments and abandoned the lease. In the same year, The Cincinnati, Dayton & Toledo Traction Company defaulted in its payments.

Shortly after July 1, 1916, suit was filed in the court of common pleas, Butler county, to foreclose the mortgage on The Cincinnati, Dayton & Toledo Traction Company's property. July 1, 1917, the road was sold, subject to prior mortgages. It was bought by a committee representing The Cincinnati, Dayton & Toledo Traction Company bondholders. That committee organized the Cincinnati & Dayton Traction Company, and the road was turned over to that company on March 1, 1918.

On the record four questions are argued and are for determination.

1. Does the extension from North Bend road to the old Cincinnati & Northwestern railroad come within the provisions of the after-acquired property clause of the mortgage of the Cincinnati & Hamilton Electric Street Railway Company?

2. Does the property of the Cincinnati & Northwestern Railroad Company come within the after-

acquired property clause of the mortgage of the Cincinnati & Hamilton Electric Street Railway Company?

3. The Cincinnati Northern Traction Company in making the improvements provided for in its lease purchased real estate, a part of which was used for a change of the right of way. Does the part of the property not so used come within the after-acquired property clause of any of the mortgages?

4. The Cincinnati Northern Traction Company purchased property north of Hamilton and constructed a power plant and high-tension transmission lines, dismantled the original power houses, and used the money derived from the sale of machinery of the original power houses in the construction of a central power house, and it is now claimed that that was an independent enterprise.

The questions to be determined grow out of the provisions of the mortgage and of the statute. The mortgage recites:

"All and singular the lines of railroad which the party of the first part has constructed, is about to or shall construct, in and upon the streets of the city of Hamilton, Ohio; and in and upon any of the roads, streets or highways of the counties of Butler and Hamilton, in the state of Ohio; or in and upon the streets or highways of any city, township, village, or hamlet in the counties of Butler and Hamilton, Ohio, or in and upon any lands or private rights of way within the counties of Butler and Hamilton, Ohio; and also all extensions of said railroad so owned or operated by the party of the first part, or which may be hereafter constructed, acquired or owned, and whether said railroad be operated by horses, electricity, steam, or any other power, to-

gether with all property, franchises, ordinances, rights, privileges and powers connected therewith.''

After describing the property covered by the mortgage as commencing at Front street in the city of Hamilton, the description of the mortgage follows:

''Thence continuing southerly along said Cincinnati and Hamilton Turnpike to its intersection with and across the North Bend Road, College Hill, Ohio.

''And also all and singular all corporate property, real or personal, lands, depots, yard-grounds, right or rights of way, and licenses, easements, buildings, erections, superstructures, stables and carhouses, depot and station buildings, waiting rooms, machine shops, blacksmith shops, iron and steel rails, frogs, chains, bars, ties, switches, turn-outs, turn-tables, bridges, trestles, rolling stock, poles, wires, engines, machinery, power-houses, cars, horses, mules, and all other things in any wise belonging or appertaining to said railroad, or extensions thereof, easements and property necessary or convenient, in or to, the ownership, use or operation of said railway, or extensions thereof, whether the said things so belonging or appertaining are now used or shall hereafter be acquired by the party of the first part; and also all corporate powers, rights, privileges and franchises incident or necessary to the ownership, maintenance and operation of said railway, or extensions thereof and property aforesaid, together with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in any wise appertaining, and the reversion or reversions, remainder or remainders, rents, issues and profits thereof, and also all the estate, right, title, interest, property, possession, claim or demand

whatsoever, as well in law as in equity, of the said party of the first part, of, in and to the above described premises and property and in every part and parcel thereof, with the appurtenances. Also all the grants, right, privileges, franchises, indemnities and exemptions which the party of the first part now has, and all which it shall hereafter acquire, under ordinances of municipal corporations, or under grants from any Board of County Commissioners, or under grants, consents or contracts from any turnpike or plank road company, or other public agencies in charge of any of the highways over and along which its railway is or shall hereafter be constructed; also all and singular all future tolls, incomes, rents and revenues.

"It is the true intent of the parties hereto that this indenture shall convey all the property, real and personal, of whatever name, kind or description now, or that may hereafter be acquired and owned by said party of the first part."

The North Bend road extension was within the chartered limits of the corporation. The definite language of the description of the mortgage copied into the bonds did not, and cannot be said to, include that extension. The rule as to after-acquired property in a railroad mortgage is that the mortgage covers such property acquired by the mortgagor, or its successor, when the property comes within the description of the mortgage. *Central Trust Co.* v. *Kneeland*, 138 U. S., 414; *Pennock* v. *Coe, Trustee,* 23 Howard (64 U. S.), 117, and *Thompson* v. *White Water Valley Rd. Co.,* 132 U. S., 68.

The rule contended for is that a mortgage containing an after-acquired property clause covers all property within the limits of the charter of the cor-

poration. There are numerous authorities supporting this contention. They will not prevail over the express terms of the limitation of the description in the mortgage itself. The case of *Compton* v. *Jesup,* 68 Fed. Rep., 263, is cited as authority for the contention that all property within the chartered limits of the railroad is covered by its mortgage. The following from that case, at page 286, is authority for our holding here:

"The extent of the property included in the grant of a mortgage by a railroad company depends on two questions: First, what property had it power to mortgage? and, second, what property did it intend to mortgage?"

From the description above quoted, it is certain that what the company intended to mortgage can best be determined from the mortgage itself, that is, its road, including power plant and earning capacity from Hamilton to North Bend road. The court is not authorized to extend the mortgage beyond the fixed limits of the description inserted therein by the parties.

2. It is also contended that the mortgage of The Cincinnati & Hamilton Electric Street Railway Company also covers the Cincinnati and Northwestern Railway Company's property. The last-named company was an independent railroad, operated as a complete railroad prior to the date of the mortgage in question. That company and the Southern Ohio Traction Company consolidated, forming The Cincinnati, Dayton & Toledo Traction Company. I do not understand that property of an independent company, not acquired by the mortgagor, and beyond the limits of the description of the mortgage, could be said to be after-acquired property, so that

the lien of the mortgage attaches. Had the Southern Ohio Traction Company consolidated with the Baltimore & Ohio Railroad Company, it could hardly be contended that the Cincinnati and Hamilton mortgage would be a first lien on all the valuable property owned by the Baltimore & Ohio Railroad Company in the city of Cincinnati. The difference between the cases of *Compton* v. *Jesup, supra,* and *Wade* v. *Chicago, Springfield & St. Louis Rd. Co.,* 149 U. S., 327, and the case at bar is that in each of these cases the extension and construction were within the chartered limits of the corporation and the description of the mortgages, while, in this case, the Cincinnati & Northwestern railroad was within the chartered limits of the Cincinnati & Hamilton Electric Street Railway Company, but was not within the description of the mortgages, and in addition there was a consolidation of two independent railroads.

The conclusion is that neither the North Bend road extension nor the Cincinnati & Northwestern Railroad Company's road was after-acquired property within the terms of the mortgage in question.

3. The evidence discloses that when the railroad was being operated by the Cincinnati Northern Traction Company under its lease, it acquired property for the purpose of improving and straightening the right of way. It purchased tracts of land at a price estimated to be no greater, and, in some instances, less, than it would have cost to appropriate the land necessary for railroad purposes and pay damages to the residue. The land necessary for the right of way was set aside and used for that purpose. The question now is whether the parts not used for railroad purposes are subject to the mortgage or mort-

gages. The court below held that such lands were not subject to the underlying mortgages. On principle, and in the absence of cases cited to the contrary, it is difficult to say on what authority it could be held that they were subject to the mortgages. The mortgages covered the railroad property. The only ground on which it might be claimed the mortgages had an interest in such property is in case it was purchased out of the earnings of the road. The mortgagors were expressly given the earnings until default in payments on the mortgages. Whether these extra lands were paid for out of the earnings of the company, or from money derived from the sale of bonds, does not appear. In any event, they could not be held to be subject to the mortgage.

## POWER PLANT.

4. The Cincinnati Northern Traction Company purchased land, and, commencing in 1905, constructed a central power house, connected with and extending therefrom were high-tension transmission lines, covering the entire system. Counsel have treated the power house as an entity, and the transmission lines as separate from the power house. For the purpose of this opinion they will be considered together, and referred to as the power plant.

The contentions of counsel present widely different views of the power plant question. Counsel insist that the transfer of the power plant from the Ohio Electric Company to the Cincinnati & Dayton Traction Company for a consideration vests the title to the power plant in the Cincinnati & Dayton Traction Company, free from any of the mortgage liens that the Cincinnati, Dayton & Toledo Traction

Company was compelled, under the statute, to preserve unimpaired.

Another contention is that as the power plant was located about 440 yards from the line of the railroad, it was an independent enterprise, and, therefore, not subject to the claims of any of the mortgages.

Another and entirely different claim is that the power plant was a subsequent accession or accretion appurtenant to the property within the chartered limits of the corporation, therefore, subject to the mortgages by reason of the after-acquired property provisions of those instruments. It is as difficult to reconcile these views, as it is to adopt either.

Two things may be stated as certain, that the mortgagees' rights grew out of the mortgages, either as expressly stated in those instruments, or as read into them by Section 9038, General Code, and that the mortgagors' liability and obligation must be determined from the same instruments, considered in connection with the statute referred to.

Section 9038, General Code, provides:

"All the rights, privileges, franchises of each company to the agreement, and all property, debts due on account of subscriptions for stock, or other things in action, are to be deemed transferred to and vested in such new company, without further act or deed. All property, rights of way, and other interests, shall be as effectually the property of the new company as they were of the companies parties to the agreement. Title to real estate either by deed, gift, grant, or by appropriation under the laws of this state, shall not revert or be impaired by reason of the consolidation. But rights of creditors, and liens upon the property of either company, shall

be preserved unimpaired, and the respective companies deemed to be in existence to preserve them. Debts, liabilities, and duties of either company, thenceforth shall attach to the new company, and be enforced against it to the same extent as if such debts, liabilities, and duties had been contracted by it."

Keeping these facts in view, the position in which the parties have placed themselves is: That each of the separate railroads had a power plant of its own; that the rights of the mortgagees under the statute attached to and became a part of the obligation of the Cincinnati, Dayton & Toledo Company. Neither that company, nor its lessee, successors, or assigns, by any agreement, to which the mortgagees were not parties, could impair the rights of the mortgagees.

The lease in question contains the following provision:

"The lessee, at its own risk and expense, and in its own corporate name, shall work and operate said lines of road, and each of them, maintain and keep it in good order and repair, and renew and replace said lines, and each of them, and their rolling stock, equipment and appendages, respectively, and all the *necessary power houses,* car and repair shops, machinery and tools of the lessee, supply additional rolling stock, and maintain and conserve the said street railway plant entire, make any and all changes, and do and perform all other things necessary to make and maintain said plant as a first-class street railroad according as public convenience and the terms of the several grants to the lessor or its predecessors in title may require.  *  *  *

"The lessee shall, at its own expense, make all

extensions, alterations, improvements, renewals, changes and replacements to plant equipment, trackage, paving, etc., necessary to meet the requirements of the business, and to satisfy the obligations of the lessor, and shall increase or change the power whenever necessary to the proper maintenance of the plant as a modern and efficient street railway system; and in the event of this lease being terminated through any fault or omission of the lessee, all additions and improvements made by it upon the demised property, and all franchises, rights and privileges obtained by it, as lessee hereunder, appertaining to said demised property, together with the entire leased property, shall be surrendered to the lessor without charge against or cost to said lessor.''

The Ohio Electric Company acquired its authority from The Cincinnati Northern Traction Company. That company in turn could only exercise the power given it by the Cincinnati, Dayton & Toledo Traction Company. The Cincinnati, Dayton & Toledo Traction Company purchased the property subject to the mortgages here being considered. It was charged with notice of the provisions of such mortgages. The Cincinnati, Dayton & Toledo Traction Company could not relieve itself of the liability imposed in the mortgages by leasing its property to the Cincinnati Northern Traction Company. Both the Cincinnati Northern Traction Company and the Ohio Electric Railway Company were, under the lease, obliged to renew and replace the rolling stock, equipment, necessary power houses, etc. So that a transfer to the road of cars by the Ohio Electric Company was not free from the obligation of the mortgage, as those cars were placed on the road for its use.

Under the statute the obligation of the Cincinnati, Dayton & Toledo Traction Company was to preserve the liens of the mortgage unimpaired. This obligation included the right of the mortgagees to have the road equipped as it was at the time the mortgages were given, that is, with power plants to operate the roads. This provision of the statute required the Cincinnati, Dayton & Toledo Traction Company, its successors and assigns, to maintain the property for the purposes of the mortgages in as good condition as it was at the time it took possession of the same. That, it did not do. That company's assignee installed a power plant and scrapped the original plants. It is now claimed that while the mortgaged property has been impaired in value, the method by which it was done relegates the mortgagees to an action in damages against an insolvent or defunct corporation. If that is the law, Section 9038, General Code, is meaningless, and of no force or effect. The statute in terms provides that the liens upon the property of either company shall be preserved unimpaired. That obligation attached to the Cincinnati, Dayton & Toledo Traction Company. That company recognized its obligation by inserting in the lease the provision quoted.

The conclusion is that the properties mortgaged were equipped with power houses; that after the roads passed to the Cincinnati, Dayton & Toledo Traction Company, under consolidation, and a central power plant had been constructed, the power plants covered by the mortgages were destroyed; and that the mortgagees are entitled to have the respective properties restored to the condition they were in at the time they were operated by the Cincinnati, Dayton & Toledo Traction Company, and in

lieu thereof to have such an interest in and lien upon the "power plant" as would equal the cost of such restoration.

The original corporations, under their authority, mortgaged the cars used in the operation of the road. These cars passed through the Southern Ohio Traction Company to the Cincinnati, Dayton & Toledo Traction Company under consolidation. The Cincinnati, Dayton & Toledo Traction Company signed a consolidation agreement containing the following provision:

"Provided, however, that until default, as aforesaid, the railway company may sell, exchange, or otherwise dispose of such materials, rolling stock and other property, as may become old, worn out, disused, or undesirable, or not needed for the purposes of the railroad, renewing the same, or substituting therefor other property of equal or greater value. The said materials or property thus substituted being covered by and subject to the lien of this mortgage, but the trustee is not, and shall not be charged with any duty as to seeing whether such substitutions are so covered."

Either the Cincinnati Northern Traction Company, the lessee, or the Ohio Electric Company, its assignee, disposed of all the cars except those mentioned in the record, and while the road was in their hands put in use other cars on the road. It is claimed that these cars do not come within the provisions of the underlying mortgages. The record discloses that prior to July, 1918, the Ohio Electric Company abandoned any rights it had as assignee of the lease, and, on July 1, 1918, The Cincinnati Northern Traction Company forfeited the lease. The road was sold under foreclosure proceedings,

instituted by the bondholders of the Cincinnati, Dayton & Toledo Traction Company, was purchased by a committee representing these bondholders, who organized the Cincinnati & Dayton Traction Company and took over the road. So that the property, while taken under the name of the Cincinnati & Dayton Traction Company, was in fact owned by the bondholders of the Cincinnati, Dayton & Toledo Traction Company.

Almost a year after the property, including these cars, had passed to the Cincinnati & Dayton Traction Company, on December 24, 1919, the Ohio Electric Company claimed that it was the owner of the cars, that they had been left on the road, and undertook for a consideration to pass the title to the cars to the Cincinnati & Dayton Traction Company. It has been held that when personal property, such as the cars in this case, passes to a railroad, prior liens, even the lien of duties due the government, cannot be asserted against a mortgage; that the property by coming into the possession of the road is subject to the lien of the mortgage in preference to any claim that the seller or the government might have upon it; that the cars were added to the road, and, therefore, became a part of it. *Pierce* v. *Emery*, 32 N. H., 484, and Jones, Corporate Bonds and Mortgages (3d ed.), Section 96.

The conclusion is that the underlying mortgages are entitled to such a lien on the cars now used in operating the road as will equal the value of cars taken over by the Cincinnati, Dayton & Toledo Traction Company at the time it leased the road to the Cincinnati Northern Traction Company.

The several mortgages cover earnings of the road. It is conceded that the earnings after No-

vember 1, 1919, should go to the mortgagees. Under the mortgage it was the duty of the operating company to make improvements, to keep the road in good condition for the benefit of the public, and to preserve the lien of the mortgages. There is no question that the Public Utilities Commission has authority to ascertain, determine, and prescribe the amount of a fund that should be set aside for depreciation or deferred improvements. This, it did not do. The only question with reference to deferred maintenance suggested by the attorney general is whether or not there should be taken out of the accumulated earnings a sum sufficient to put the road in the condition it would have been had the operating company properly maintained it. Had the operating company used the accumulated money for renewing, restoring, replacing and substituting depreciated property, the road would have been more valuable at the time of the sale than it was, and the mortgagees would have benefited by its increased value. No good reason is assigned, and no authorities have been cited for compelling the mortgagees to accept the proceeds of the sale of a depreciated property and at the same time take from them all interest in the accumulated income. The obligation of the mortgagors, their successors or assigns, to the mortgagees, was to preserve the value of the security by using reasonable means to maintain the road. The mortgagees had the right to require the mortgagors to account for the depreciation in the value of the mortgaged property due to improper maintenance. See *Davis* v. *Virginia Ry. & Power Co.*, 229 Fed. Rep., 633.

Neither the operating company nor the Public Utilities Commission was diligent in maintaining

the roads in a proper condition for the convenience of the public, and for the purpose of preserving the liens of the mortgagees, as required by Section 9038, General Code.

The conclusion is that after default, demand having been made, the net earnings of the road should be apportioned among the several divisions on the basis of their earning capacities.

The mortgagees may have a reference to a master, if that is desired, to determine the several interests in the power plant, the rolling stock and the accumulated earnings according to the findings herein stated.

A decree may be prepared to conform to the views herein expressed.

*Judgment accordingly.*

HAMILTON, P. J., and BUCHWALTER, J., concur.