### SECURITY–FIRST NAT. BANK OF LOS ANGELES et al. v. RINDGE LAND & NAVIGATION CO. et al.*

### No. 7965.

Circuit Court of Appeals, Ninth Circuit.

Aug. 17, 1936.

*For opinion on rehearing, see 86 F.(2d) 3.

Orrick, Palmer & Dahlquist and Garret W. McEnerney, all of San Francisco, Cal., for appellant Pacific States Savings & Loan Co.

Newlin & Ashburn, Gurney E. Newlin, A. W. Ashburn, and Clyde E. Holley, all of Los Angeles, Cal., for appellant Security First Nat. Bank of Los Angeles.

John W. Preston and Agnew & Boekel, all of San Francisco, Cal., Rea, Free & Jacka, of San Jose, Cal., and Marvin Osburn, of Los Angeles, Cal., for appellee Rindge Land & Navigation Co.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

DENMAN, Circuit Judge.

This case is before us upon appeals from an order and decree of the District Court confirming a plan of reorganization proposed by the Rindge Land & Navigation Company, hereafter called "Debtor," pursuant to section 77B of the Bankruptcy Act (11 U.S.C.A. § 207), denying a petition by appellant Pacific States Savings & Loan Company to dissolve an order staying a trustee's sale upon property of the Rindge Company and denying a petition by the same appellant to dismiss the bankruptcy proceedings.

The Debtor was, in 1929, the owner of four tracts of land in California, three lying in San Joaquin county and the fourth in Contra Costa county. The total area of these tracts is upwards of 21,000 acres, 19,000 of which are agricultural lands leased to tenant farmers. In 1929 Debtor issued 6 per cent. bonds in the aggregate principal amount of $1,820,000 secured by a trust indenture on the real properties mentioned. Appellant bank is the trustee under the indenture. Of the bonds so issued, $1,781,000 are still outstanding. Interest on the bonds was to be paid semiannually, and the trust deed authorized the trustee (on written direction of 25 per cent. of the bondholders) upon default in the payment of any installment of interest to declare the entire principal sum immediately due and payable.

On July 1, 1932, Debtor defaulted in its interest payments, which default has continued down to the time of this action. A

bondholders' committee was formed in October, 1932, which committee acquired more than 90 per cent. of the outstanding bonds. In June, 1933, the trustee bank, acting on orders from holders of more than 25 per cent. of the bonds, declared the entire amount of the bonds due and payable, and demanded, without success, that Debtor turn over the properties to the trustee.

An action to force the debtor to deliver the properties to it was then commenced by the trustee in the superior court of California for San Joaquin county, such action being based upon a covenant in the trust indenture that upon default in payment the Debtor would convey the properties to the trustee. A receiver was appointed for the Debtor. At the same time, the trustee bank noticed a sale of the property pursuant to the trust deed provisions. The sale was halted by temporary injunction in an action instituted by the Debtor in the state court. While this action was pending, various negotiations were had between the Debtor and the bondholders' committee looking to a settlement by means of the Debtor taking over the bonds at rates not more than 30 cents on the dollar. These negotiations failed, the injunction action was dismissed, and the trustee noticed a sale of the properties for September 24, 1934.

On September 21, 1934, Debtor commenced this action in the United States District Court, by filing a petition for reorganization under section 77B. The petition set forth that the assets of the Debtor consisted almost exclusively of the lands covered by the deed of trust securing the bonds; that there was outstanding some 25,000 shares of common capital stock of the Debtor, of an aggregate par value in excess of $2,500,000; that the Debtor's liabilities included the bond obligations in the amount of $1,781,500, together with interest thereon, $200,000 owed to unsecured creditors, and $70,000 in unpaid taxes, totaling $2,051,500, plus interest; that the Debtor was informed and believed that the land subject to trust deed was reasonably worth $2,614,421.25, but that due to the prevailing economic situation it would be impossible to obtain a fair price on the proposed trustee's sale; that if the sale were not enjoined, there would be realized thereon only sufficient to pay the bondholders a small fraction of the face value of their holdings, leaving nothing for the unsecured creditors or the stockholders; that if Debtor was permitted to do so it would prepare a plan of reorganization suitable to all parties and to the court. The petition concluded with a prayer for approval and for a decree staying the proposed trustee's sale.

The petition was approved and the stay granted. Between September 21, 1934, the date of this petition, and the end of December, two groups commenced negotiations with the bondholders' committee, each seeking to take over the bonds and the property securing them. One group was the "Free-Reed" syndicate, closely allied to, if not representing, the Debtor. The other was working entirely in the interest of appellant Pacific States Savings & Loan Company. This group will be referred to as "Pacific States." The result of these negotiations was that in the early part of January, 1935, Pacific States purchased from the bondholders' committee 98 per cent. of the outstanding bonds at 40 cents on the dollar, plus $66,000 committee and trustee expenses. The negotiations leading up to this transaction and the struggle between Pacific States and the Free-Reed syndicate to get control of the lands are deemed by the Debtor to be of controlling significance on this appeal. Briefly, they included bids and counter bids on the part of the two interested groups, some of the offers contemplating a purchase of the Debtor's equity in the lands as well as taking over the bonds. Bids for the bonds ranged between 30 and 40 cents on the dollar. At no time did either of the contesting groups offer to the bondholders a better price than that at which the bonds were finally sold to Pacific States.

The Debtor urges and the master found, and for purposes of this appeal we take it as true, that throughout the course of the bidding and counter bidding, the Free-Reed syndicate was placed at a distinct disadvantage due to preference shown by the bondholders' committee to Pacific States. Thus on one occasion the syndicate offered 30 cents and on another 35 cents for the bonds, both offers being a gross price, that is, including trustee and committee expenses. The committee refused the bids on the ground they would consider only net offers, yet prevented the syndicate from making an intelligent net bid by refusing until late in December, 1934, to disclose any estimate of what these expenses might be. It is a reasonable inference that during this interim the Pacific States group had a fairly accurate estimate of the expenses. On December 24, the syndicate was informed that the expenses would be $61,000. On

December 26, Mr. Reed of the syndicate came down to Los Angeles from San Jose prepared to offer 35 cents net for the bonds plus $61,094.87 trustee and committee expenses. He had a certified check for the last-named amount which the syndicate had authorized him to give the committee. He was informed then by the committee that the expenses would be $66,000. On December 31, the committee received the offer, which was finally accepted, from Pacific States of 40 cents plus $66,000 expenses, which it immediately communicated to the bondholders with recommendation of acceptance. There is some evidence that the Free-Reed syndicate was kept unadvised of this bid until too late to better it. There is no evidence, however, that Free-Reed would have gone any higher.

During the period of these negotiations preliminary plans of reorganization pursuant to section 77B were being drawn by the Debtor. On February 8, 1935, at which time 98 per cent. of the bonds had passed to Pacific States, Debtor filed its second amended plan of reorganization. This plan contemplated a sale to A. M. Free, of the Free-Reed syndicate and an attorney for the Debtor, of three of the four tracts comprising the Rindge properties. The consideration for this conveyance was to be a sum sufficient to pay bondholders 40 cents on the dollar, plus $66,000 trustee and committee expenses. In addition, the debtor was to have $40,000 with which to develop the fourth or "Palm" tract, not conveyed to Free. In the event that the holders of 76 per cent. of the bonds did not consent to the plan, " * * * then and in such latter event the Debtor Corporation proposes to pay or cause to be paid to each and all of said Bondholders in cash the amount of their claims in full, if, as and when allowed by the Court herein, *namely, the actual consideration paid by them for said bonds,* together with interest * * * from January 15, 1935 * * *." (Italics supplied.)

As later modified, the plan provided for the payment to Pacific States of 40 cents on the dollar on its 98 per cent. of the bonds, and payment of the remaining 2 per cent. at face value.

After the submission of this plan of reorganization by the Debtor, Pacific States filed a bill in intervention and subsequent motions setting forth that as holder of 98 per cent. of the bonds it did not consent to such plan of reorganization and praying that the stay of trustee's sale be vacated and the bankruptcy proceedings dismissed. The Debtor's plan of reorganization and the motions of Pacific States came on for hearing before the referee, who found the facts substantially as alleged in the Debtor's petition and as set forth herein. The referee concluded that the plan of reorganization was equitable and feasible, and should be confirmed; and that the motions of Pacific States should be denied. On August 3, 1935, the District Court adopted the findings and conclusions of the referee and confirmed his report. On September 3, 1935, a final decree was entered by the court, again approving and confirming the referee's report, approving the Debtor's plan of reorganization, and denying the motions of Pacific States. Appeals from the order and the decree were taken by Pacific States and by the trustee bank.

The question on this appeal is whether, under the circumstances disclosed in this case, one who purchases bonds at 40 per cent. of their face value may be forced, under reorganization proceedings instituted by the obligor on the bonds, to accept in full payment for his holdings only the amount he paid to acquire the bonds, while his obligor retains to its own use a portion of the property pledged to secure the bond obligation.

Section 77B, subd. (e), of the act (11 U.S.C.A. § 207(e), provides that a plan of reorganization shall not be confirmed unless approved by creditors holding two-thirds in amount of the claims of each class whose claims have been allowed, but provides further: "That such acceptance shall not be requisite to the confirmation of the plan by any creditor or class of creditors (a) whose claims are not affected by the plan, or (b) if the plan makes provision for the payment of their claims in cash in full, or (c) if provision is made in the plan for the protection of the interests, claims, or liens of such creditor or class of creditors in the manner provided in subdivision (b), clause (5), of this section."

Subdivision (b), clause (5), 11 U.S.C.A. § 207(b)(5) specifies that a plan of reorganization "shall provide in respect of each class of creditors of which less than two-thirds in amount shall accept such plan (unless the claims of such class of creditors will not be affected by the plan, or the plan makes provision for the payment of their claims in cash in full), provide adequate protection for the realization by them of

the value of their interests * * * by such method as will in the opinion of the judge, under and consistent with the circumstances of the particular case, equitably and fairly provide such protection."

It is the Debtor's position on this appeal that the claim of Pacific States as a nonassenting bondholder is provided to be paid in full under subdivision (e) or is adequately protected under subdivision (b), clause (5), by the payment to Pacific States of the consideration paid by it in acquiring the bonds, that is, 40 per cent. of the face value of the bonds.

We cannot agree with this contention. The legal value or property right in an obligation is the right to recover from the maker to the entire extent of his promise to pay. The consideration given for a security by the holder thereof is immaterial. Wade v. Chicago, Springfield & St. Louis R. Co., 149 U.S. 327, 343, 13 S.Ct. 892, 37 L.Ed. 755; In re Tennessee Publishing Co. (C.C.A. 6) 81 F.(2d) 463, 466. Manifestly, therefore, a plan of reorganization which gives bondholders only 40 per cent. of the face value of their holdings does not make "provision for the payment of their claims in cash in full."

It is equally well settled that a plan of reorganization does not "provide adequate protection" to creditors, within the meaning of subdivision (b), clause (5), when it gives such creditors only a fraction of the face value of their holdings. In a recent proceeding under section 77B which came before this court, the contention was urged that certain bondholders received "adequate protection" by acquiring bonds of about half the face value of their former holdings. In rejecting the argument, this court held that the protection for creditors specified in the act must be "completely compensatory." Francisco Bldg. Corp. v. Battson (C.C.A. 9) 83 F.(2d) 93. A like conclusion was announced by the Sixth Circuit in Re Tennessee Publishing Co., supra.

There is nothing in section 77B which authorizes a debtor to pay a secured creditor less than half the amount of the debt while retaining to its own use a portion of the property securing the debt. The right to retain a lien until the debt secured thereby is paid is a substantive property right which may not be taken from the creditor consistently with the Fifth and Fourteenth Amendments to the Constitution. Louis-ville Joint Stock Land Bank v. Radford, 295 U.S. 555, 594, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106.

The Debtor admits the general application of these principles but contends a payment to Pacific States of only the consideration it paid for the bonds is called for in this case because of what is termed the "inequitable" conduct of Pacific States and the bondholders' committee in preventing the Free-Reed syndicate from effective bidding for the bonds. In effect, the Debtor is contending that when a holder of a promissory obligation is approached by two purchasers who wish to acquire it, and sells the obligation to one of them without holding an open auction between the two of them, the sale may be rescinded. Further, it is contending in effect that the benefit of this rescission inures primarily not to the vendor of the losing bidder, but operates rather to discharge the obligor of his debt at less than half its amount.

There is no merit in Debtor's contention for two reasons. In the first place, there is nothing "inequitable" in a bondholder selling his bond to whom he pleases at whatever terms suit him. It must be remembered in this connection that as between the Debtor and the bondholders' committee the latter is nothing but a bondholder. It is of the essence of property, in a bond as well as in any other form, that it may be freely transferred by the owner to any one who is willing to take it at whatever terms at which the two may arrive. Where A and B are both bidding for a bond, the holder may conceal from A the terms offered by B, may hinder A in every way possible, and ultimately sell to B at a price less than what A might have offered, yet there is no principle of law or equity which will operate to upset the sale. If A offers a bondholder $500 for a bond worth $100, the holder is quite within his rights in selling it to B for one cent, for no better reason than that it pleases him to be eccentric. The reductio ad absurdum of the Debtor's contention is that if a woman holding the mortgage note of a debtor petitioning under section 77B, refused the debtor's offer of 50 per cent of its face, telling him she did not like his red hair and squint, and then gave it gratis to her favorite movie actor, the donee would have to surrender it gratis to the debtor.

Section 77B, subd. (a), 11 U.S.C.A. § 207(a) gives the court equity powers, but it does not purport to alter long established

incidents of property by introducing a vague and indefinable "equity" into the proceedings. See In re Judith Gap Commercial Co. (C.C.A. 9) 5 F.(2d) 307, 309.

The second respect in which the Debtor's argument fails of conviction is that if there was any inequity in the dealings between the bondholders' committee and Pacific States, the only persons damaged are the committee's principals, the bondholders themselves. They would be injured and would be entitled to redress had their agent, the committee, deliberately sold the bonds on their behalf for a price less than could have been obtained. As before remarked in this connection, the evidence before the master gives no hint that a better offer than that of Pacific States would have been made by Free-Reed, had the latter been given ample opportunity to bid again; at no time did Free-Reed offer as much as the Pacific States terms which were finally accepted.

The only fiduciary obligation disclosed in this case is one owed by the committee to the bondholders. Because of the opportunity for fraud which that relationship offers to unscrupulous committees, section 77B provides for careful examination by the court of the activities of these committees. The judge must approve all statements of committee expenses. Subdivision (f), clause (5), 11 U.S.C.A. § 207(f)(5). When creditors file their acceptance of a plan, they must file with it a statement showing what claims have been purchased or transferred by the acceptors, and the circumstances of such purchase or transfer. Subdivision (e), 11 U.S.C.A. § 207(e). The act further provides: "That the judge shall scrutinize and may disregard any limitations or provisions of any depositary agreements, trust indentures, committee or other authorizations affecting any *creditor* acting under this section and may enforce an accounting thereunder or restrain the exercise of any power which he finds to be unfair or not consistent with public policy and may limit any claims filed by such committee member or agent, to the actual consideration paid therefor." (Italics supplied.) Subdivision (b), clause (10), 11 U.S.C.A. § 207(b)(10).

The purpose of these provisions is plainly to protect creditors, particularly from the possible machinations of those who owe them a fiduciary obligation. There is no fiduciary obligation between a creditor and a debtor. There is none such between a mortgagee and mortgagor. De Martin v. Phelan, 115 Cal. 538, 542, 47 P. 356, 56 Am.St.Rep. 115. As pointed out before, a debtor may not complain of the manner in which his creditor disposes of his own property. Nor may one who was unsuccessful in persuading the creditor to dispose of it to him. See In re Realty Foundation Properties (C.C.A. 2) 75 F.(2d) 286, 287. If, in the case before us, there is anything in the conduct of the bondholders' committee and Pacific States warranting complaint, and none such appears, it is only the bondholders who can complain, and no bondholder has complained in this action.

There is nothing in the several cases cited to us by the Debtor which casts any doubt upon these principles. In Scott v. Symons, 191 Cal. 441, 451, 454, 216 P. 604, an agent sold his principal's property to the defendant in violation of instructions. The defendant knew of the agent's breach of trust. The court held the principal entitled to recover the property from the defendant, inasmuch as the latter had connived in the breach of a fiduciary duty owed by the agent to the principal. No such fiduciary obligation here exists between the Debtor and bondholder.

In re McCrory Stores Corp. (D.C.N.Y.) 12 F.Supp. 267, was a petition by a debtor under section 77B, wherein a former officer of the debtor corporation bought up landlords' claims against the debtor at a discount and sought to enforce them for their full value. The court approved a plan of reorganization which paid the officer only the amount he had given for the claims. The theory of the case was that inasmuch as the creditor's acquisition of the claims had been consummated with the aid of his position as officer of the debtor corporation, and his fiduciary obligation to the corporation had been violated, he could take no gain from the transaction.

Prosser v. Finn, 208 U.S. 67, 28 S.Ct. 225, 52 L.Ed. 392, held that an employee of the United States Land Office cannot make an entry on public lands of the United States and perfect title to himself, inasmuch as he is under an obligation not to use his position of trust to reap a benefit personal to himself.

Jackson v. Ludeling, 21 Wall. 616, 622, 22 L.Ed. 492, held that a minority bondholder may not foreclose a mortgage without notice to the great majority of bondholders or to their trustee, and that if he does so the mortgage sale may be set aside.

In Louisville Trust Co. v. Louisville N. A. & C. Ry. Co., 174 U.S. 674, 684, 19 S.Ct. 827, 43 L.Ed. 1130, it was held that a mortgagor may not connive with the mortgagee inequitably to cut out the rights of unsecured creditors. Neither of these cases involved a controversy between a mortgagor and mortgagee.

Palmer v. Bankers' Trust Co. (C.C.A. 8) 12 F.(2d) 747, involved a reorganization proceeding wherein all the bondholders were represented by a trustee. After a reorganization plan was formulated and adopted, a minority bondholder, who had acquired his holdings subsequent to the commencement of the reorganization, sued to have the agreement set aside. The court held that the trustee had acted fairly and consistently with the interests of all bondholders, plaintiff included, and said further that a plan fair on its face will not be permitted to be upset by a minority bondholder solely as a means of obtaining a greater advantage than all bondholders can receive, particularly when the dissenter obtained his bonds for speculative purposes after the beginning of the proceedings. No question of the relationship between bondholder and debtor was involved.

In re Cosgrave (D.C.) 10 F.Supp. 672. It was the debtor not the creditor whose conduct as a "speculator in the equity" was under consideration. It was held there that the purchase of the equity in a heavily mortgaged apartment house for a nominal sum for the purpose of invoking the bankruptcy act to prevent the foreclosure of the mortgages, made the filing in bankruptcy not in the good faith required by the statute. The decision has no application to this appeal.

In Guaranty Trust Co. v. Chicago, Milwaukee, etc., Ry. Co. (D.C.) 15 F.(2d) 434, 443, minority bondholders holding 20 per cent. of the bonds objected to an upset price for the sale of the mortgaged properties fixed at the request of 80 per cent. of the bondholders. The court first found that the petition was not well grounded. In denying the petition of the 20 per cent. of the bondholders for a higher upset price, it adds: "One fact alone precludes the adoption of these excessive upset prices at the insistence of the Jameson committee. A very considerable portion of the bonds represented by the Jameson committee were acquired by their present owners, either shortly before the receivership or during the pendency of this litigation. These were purchased at prices around 50 cents on the dollar. Their owners are here protesting that more than 80 per cent of the junior bondholders shall not even be given a chance to have a bid for the property considered, except upon terms which will give to the dissenting bondholders a distributive share in the proceeds of the sale yielding more than 80 cents on the dollar—a profit to the dissenters of several million dollars. Nothing more than the statement of this proposal is required. It cannot be adopted." Guaranty Trust Co. v. Chicago, Milwaukee, etc., Ry. Co., supra, 15 F.(2d) 434, 443.

Here 98 per cent. of the bondholders were not seeking any undue advantage over the remaining 2 per cent., nor asking anything more than that they shall realize upon the bonds as much as their security will yield.

We understand the dissent does not deny to the holder of the bonds the right not to sell them for less than par and interest upon the offer of a lesser amount from the debtor, or the bondholder's right to continue to seek to obtain as much from the security as it will yield on foreclosure. The principle it seems to seek to establish is that if the bonds are sold to a third party these rights of the seller are not transferred to the buyer, if the debtor offer a sum equal to that offered by the buyer.

As stated, since the statute gives no such legal right to the debtor, only through the creation of a new right *in equity* can such a principle be established.

Analysis shows the application of such a principle would be grossly inequitable to the holder of the secured debt. It would destroy or impair its sales value. Buyers purchase bonds or other secured indebtedness primarily from the profit motive. This is particularly true where the purchaser acquires a lawsuit along with the debt. He expects to realize out of the purchase more than the purchase price, at the same time running the risk of recovering less. Under the proposed equity, a buyer, confined to the maximum of his purchase price, buys nothing but the chance to "break even" or make a loss. In this situation the debtor, securing financial backing, often could force the sale of the creditor's bond at less than its current value. Such a debtor would never begin his offers at a fair current price for the bond, but would make a low one. He would realize that it was extremely unlikely that any one else would

bid, since, under the equitable right attempted to be created, he could command the purchase of the property at his competitor's offer. If the third party persuaded the holder to sell to him at the debtor's price, he acquires nothing but a risk of loss.

Inasmuch as Pacific States, as holder of 98 per cent. of the bonds is definitely opposed to the confirmation of the Rindge Company's plan of reorganization, the cause should be returned to the District Court, with directions to dismiss the proceedings and vacate the stay of trustee's sale, unless Pacific States is paid the amount of its claim in cash in full.

Reversed.

GARRECHT, Circuit Judge (dissenting).

Appellants insist that the Pacific States Savings & Loan Company occupies before this court the position of an ordinary purchaser, in good faith and for value, of the bonds of the debtor appellee, and their citations of many authorities with the arguments based thereon apply to such a situation.

Appellees do not deny "that generally, under normal conditions and in the absence of inequitable conduct a party may, after adjudication in bankruptcy, sell his claim against the bankrupt at a discount to a third person, who, in turn, can file it against the estate of the debtor for its face value." But in this case appellees "seek to hold the assignee to the costs and expenses incurred in purchasing the claims because of its boldly avowed and ruthless efforts to subvert the purposes for which section 77B was enacted." They further argue: "It is the inequitable and willful conduct of the claimant that has impelled us to ask that the conscience of equity find expression in applying a constructive trust or other fraud rectifying remedy in favor of the Debtor's estate. If this were an equity receivership or a regular bankruptcy proceeding, the relief we ask would be equally authorized. It is not a new doctrine that we here invoke. We assert that section 77B has enlarged the powers of the Court in giving new relief to distressed debtors but apart from such enlargement we are asking only that the old principles be applied to a situation which is new only in the manner and extent in which the Appellants' inequitable conduct has expressed itself."

It is asserted that the prize at stake in this suit is 21,000 acres of the finest land in the state of California, now of great value and of even greater potential value in the near future.

Appellant the Pacific States Savings & Loan Company, in a letter addressed to the Building and Loan Commissioner of California under date of January 2, 1935, among other things stated: "* * * While it is true that the bonds have been in default for some time, and the properties securing them are now being operated by a receiver, and the debtor corporation has filed proceedings for a reorganization in the District Court of the United States, it is reasonably certain that if more than two-thirds of the bonds could be acquired, the owner of such percentage of the bonds could effectually control foreclosure proceedings and, by making some form of reasonable settlement with the equity owner, could obtain title and possession to the properties securing the bonds. This particular holding is one of the most famous farming properties in the State of California. If Pacific States Savings could acquire this holding, on the basis which has been offered to it, in exchange for its foreclosed real properties, it is almost certain that the investors of Pacific States Savings would reap great benefit therefrom."

With this letter there was inclosed a copy of the report of Mr. C. A. Melcher, the farming expert for the corporation, which set forth descriptions, statistics of returns, appraisal, and other data which demonstrate the great value of this tract of land.

In his report this expert further stated that an appraisal made about six years before by the executive president of the Bank of America, a man who had lived many years in the vicinity and who was thoroughly familiar with the property, had placed the value at $2,005,000.

After careful consideration, the author of the report states that he is convinced that the value of the property at the time of the report was approximately $1,363,040. The facts and figures upon which he based this opinion will be more fully stated hereafter.

In this report it is further stated: "The property has great possibilities if properly financed and managed and with only a moderate increase in price for the products of the area it would show a satisfactory return on a valuation of double of today."

This information procured by the appellant to enable it to act with full knowledge of the situation convinced the District Court that the debtor had a very considerable equitable interest in the premises.

The decree of the District Court is predicated upon findings to the effect that after the initiation of these proceedings in bankruptcy, and with full knowledge of a plan for reorganization certain interested parties, among them these appellants actuated by a purpose to wipe out this admittedly valuable interest of the appellee debtor, and as well all claims of unsecured creditors, entered into a scheme or combination to prevent fair competition whereby they were able to purchase the bonds of the debtor which were under the control of appellants at a price less than their real value with the further intent of blocking any reorganization plan pending or which might be proposed in the bankruptcy court. Under the circumstances shown to exist, the court determined that the acquisition of these bonds was tainted with fraud.

Under section 77B (b), 11 U.S.C.A. § 207(b), the court had power to approve a plan of reorganization where adequate protection was provided for claims or liens by payment in cash of the value of such claim or lien. This section concludes with this significant language: "Provided, That the judge shall scrutinize and may disregard any limitations or provisions of any depositary agreements, trust indentures, committee or other authorizations affecting any creditor acting under this section and may enforce an accounting thereunder or restrain the exercise of any power which he finds to be unfair or not consistent with public policy and may limit any claims filed by such committee member or agent, to the actual consideration paid therefor. The running of all periods of time prescribed by any other provisions of this title, and by all statutes of limitations, shall be suspended during the pendency of a proceeding under this section."

The court determined that by reason of the fraudulent conduct of appellants their claim could only be allowed for the money actually paid for the bonds, with interest, payment for which in full was provided for by the reorganization plan offered in the decree. This placed these claimants in the position where their acceptance of the plan was not necessary because they were awarded complete compensatory protection to the full amount of any claim that could be allowed.

One of the purposes, if not the chief purpose, conferred by section 77B of the Bankruptcy Act, was to enable the bankruptcy court to grant relief to debtors, who had large holdings of property the real value of which had been greatly reduced by the depression leaving the owner for the time being, financially helpless. This was a lawful purpose. The Supreme Court has decided that the powers of Congress extends to the relief of debtors as well as to the assistance of creditors and definitely established the proposition that a bankruptcy law enacted for the relief of debtors was within the purview of the Constitution. Hanover Nat. Bank v. Moyses, 186 U. S. 181, 22 S.Ct. 857, 46 L.Ed. 1113; Collins v. Welsh (C.C.A.) 75 F.(2d) 894, 99 A.L.R. 1319.

Courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity. Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island Ry. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110.

After the parties are brought into the bankruptcy court, the interests of all, creditors and debtor alike, are to be determined according to the principles of equity. Viewed in this light, let us look at the record. The report of the master accepted by the court, inter alia, says:

"It seems to me that it would be most inequitable to permit this creditor to make a profit off this debtor of something like a million dollars by the means which it pursued. It claims that there was no equity in the properties for the corporation debtor nor for its stockholders. But this is as typical a case of frozen assets as can be found anywhere in the United States.

"According to the appraiser who examined the properties involved for the Pacific States Auxiliary Corporation and for the Pacific States Building and Loan Company before the deal by which these bonds were acquired was consummated, it is the richest land in California. This agent of the purchaser appraised the property as of the present value of One Million Three Hundred Sixty Thousand and Forty Dollars ($1,360,040.00). In good times, when prices of farm products were normal, land in the neighborhood similar to some of these tracts sold as high as Three Hundred and Fifty Dollars ($350) per acre. An adjoining tract sold during the depression at Fif-

566

ty Dollars ($50.00) an acre, but that was a panic price. With products of the time of the report of this appraiser, with the price of products as of that time, the estimated value was One Hundred and Fifty Dollars ($150) to Two Hundred Dollars ($200) an acre. The land is assessed for One Million Eighty-one Thousand Three Hundred and Twenty Dollars ($1,081,320.00) by the County Assessor of San Joaquin County. This is said by the Assessor to be on the basis of forty per cent (40%) of its real value. This would build up the actual value to Two Million Seven Hundred Three Thousand Five Hundred Dollars ($2,703,-500.00). This, is, therefore, strictly a case of frozen assets, the kind of cases which section 77B of the National Bankruptcy Act was formulated and enacted to meet.

"Thus it will be seen, that barring the depression of the past four or five years, there was a good margin of value over the bonded indebtedness. It is really a magnificent property.

"Take the property at what is clearly its actual value, and the profit of the purchaser of these bonds, if permitted to receive a hundred cents on the dollar for the bonds, would be, upon the figures of the County Assessor, the difference between the price paid for the bonds and Two Million Seven Hundred Three Thousand and Five Hundred Dollars ($2,703,500.00). Add the money in the hands of the trustee as shown by his recent report, namely, $70,000.00, and on their own expert's figures, the actual value that they would obtain for their bonds is One Million, Four Hundred Thirty Thousand Dollars ($1,430,-000.00). For this value, they paid not far from Eight Hundred Thousand Dollars ($800,000.00). Upon their own agent's appraisal, the profit will be over half a million dollars. Upon the Assessor's figures the profit would be nearer Two Million. Counting out ten per cent, a most liberal reduction for levees and ditches and waste lands and figuring the value as in prosperous times, the value now would be four and a half million dollars. Of course, this is an extravagant figure at present. The sale at Fifty Dollars ($50) in the neighborhood took place at a time when there was no market. * * *

"There has been no market and is no adequate market now. To value this land as of the present market is, in my opinion, to ignore the intent with which section 77A and section 77B of the National Bankrupt-

cy Act [11 U.S.C.A. §§ 206, 207] were passed. Both apply here. Section 77B is declared by section 77A to confer upon the court in addition to other bankruptcy proceedings, 'additional original jurisdiction for the relief of debtors'. The Congress had the debtor chiefly in mind when it passed section 77B. It is the primary purpose of section 77B to relieve debtors whose assets are frozen by lack of market, of which this is a typical case. Of course, creditors cannot be overlooked; this includes unsecured creditors, as well as secured, however, I am satisfied that there is substantial equity in the property over the bond issue for unsecured creditors and even for the stockholders of the debtor.

"In the absence of direct fraud, nothing could be more inequitable than to permit the Pacific States Building and Loan Company, after purchasing these bonds by preventing fair and open bidding for them, to deprive this debtor of its equity in this property by taking advantage of a frozen market. I conceive it to be the duty of the court to protect the equity of a debtor so far as it can do so without injury to the creditor. Here, this creditor would not be injured in the least by the plan proposed. It will get all it paid for these bonds and its interest."

Further, paragraph IV of the findings of fact adopted by the court is as follows: "The Pacific States Building and Loan Company acquired bonds owned by it from the owners thereof by preventing open and free bidding therefor. It made its purchase through an associated corporation, the Pacific States Auxiliary Corporation, which was the active agent in the purchase of the bonds and was controlled by a holding company, which also controlled the Pacific States Building and Loan Company. The three companies are practically one organization, and for business purposes and in this transaction, the three corporations were so closely identified as to be one legal entity. The Pacific States Auxiliary Corporation acquired these bonds for the account of the Pacific States Building and Loan Company by combining and agreeing with the officers and agents of the trustee under the bond issue and the Rindge Land and Navigation Company Bondholders' Protective Committee and its officers and agents to prevent, and did prevent, open and free and fair bidding for these bonds, and thereby preventing a bona fide bidder, who stood ready, willing and able to pur-

chase the bonds at the price fixed in the plan or reorganization now proposed, from having an open and equal chance to bid for the bonds with the same information and upon the same terms as were given to the Pacific States Auxiliary Corporation, the agent which purchased the bonds for the Pacific States Building and Loan Company. The attorneys and agents of the Bondholders' Protective Committee and of the Pacific States Auxiliary Corporation contrived together to withhold information from this bidder upon which he could base an intelligent offer for the bonds and did this for the purpose of assisting Pacific States Auxiliary Corporation to purchase the bonds at the price which they agreed to pay and did pay therefor."

These findings are supported by evidence of a combination participated in by appellants with the avowed purpose of depriving the debtor of every interest in its property. This is disclosed by the letter written by the attorney for the bidders to the attorney for the committee which appears in the record, which begins as follows:

"Pacific States Auxiliary Corporation, as you undoubtedly know, has finally terminated all negotiations with the Rindge Land and Navigation Company, and has no intention of resuming any negotiations with it. I feel that we are entirely free to align ourselves definitely with the bondholders and from now on completely disregard the equity holder.

"I have definitely come to the conclusion that it is necessary for the committee to carry the fight to the Rindges and make a knock-down drag-out battle of the matter; and that it is equally imperative for us to line up with the committee, and for all of us to take the view now to fight out the matter along the lines of wiping out the stockholders entirely."

And which concludes in this forceful and suggestive language: "I wish you would call a committee meeting to discuss the entire matter de novo in the light of our new offer, as I think it changes your entire strategy and supplies you with a weapon to annihilate the equity owner."

The foregoing are only a few excerpts from a mass of evidence of similar import.

The master reported to the court "that the Committee and trustees did not act in good faith, * * * that the Bondholders' Committee did not get the best possible bid for the bonds as it was their duty to do. They combined with the Auxiliary Corporation and prevented the debtor corporation from getting anything out of the deal when it is clear that they could have secured the same price that they got for the bonds and something for the debtor corporation as well."

It is no answer to say that the original bondholders are not here complaining. Some of them may never have known the facts; others may have been more interested in the acquisition of the property. In any event, the debtor and the unsecured creditors were deprived of their rights, and they are demanding redress.

The facetious allusion in the majority opinion to the feminine movie fan, whose distaste for red hair betrayed her into foolish financial conduct, has no application to the facts in this case, and the diversion fails to justify the inequitable conduct of the appellants as appears from the record, or destroy the force of the findings of the District Court.

We are not dealing with any innocent or capricious bondholder or even with one who has purchased a defaulted bond as an honest investment. These appellants were not among these innocent original bondholders who had paid full value in money for their bonds and who had been edged out of the proceedings at 40 cents on the dollar, nor were they even speculators in doubtful equities. No. They were corporations whose adroit manipulations were comparable to the clever tricks of the surething artist. It is not strange that the tactics resorted to by appellants in the proceedings before a court of equity shocked the conscience of the chancellor.

Here the appellants first formulated a scheme the effect of which was not only to deprive the legitimate bondholders or original owners from receiving the actual value of their bonds, but particularly to defeat the approval by the court of any plan whereby the debtor might satisfy all of his creditors and have something left. The court which found that such an inequitable plot had been perpetrated could not permit the parties to profit by their wrongdoing, and the rights of the debtor and unsecured creditors to be defeated or swept away by conspiracy and deceit. Settled principles of equity should prevent this purchaser of the bonds from enforcing any claim for more than the amount paid with interest and expenses as was determined

by the District Court. In re McCrory Stores Corporation, 12 F.Supp. 267. Further, as pointed out In re Cosgrave (D.C.) 10 F.Supp. 672, in the enactment of the Bankruptcy Act it was not the intention of Congress to afford relief to speculators in equities.

Provisions in bankruptcy statutes authorizing competition have been held not to be contrary to the Fifth or Fourteenth Amendment. Moreover, in this case we need not be concerned with either of these amendments because they are not pertinent in view of the findings made which should be accepted as based on the evidence. The appellants, who have acquired bonds through fraudulent manipulation in the matter pending before the court, are not in position of the assignors and are not assignees in good faith, and their position is no longer that of preferred lien creditors to the full amount of the bonds. This preferred status they forfeited by their inequitable conduct and thereby subjected themselves to the equity powers of the court to determine that the only claim which could be considered was for the return of the money, interest, and costs and this the court ordered.

A court of bankruptcy, being a court of equity, looks through the form to the substance of the transaction. In re Knickerbocker Hotel Co. (C.C.A.) 81 F.(2d) 981.

Equity will not aid those who defraud or deceive. In Re Wision & Golub, Inc. (C.C.A. 2) 84 F.(2d) 1, decided June 15, 1936.

As sustaining the proposition that a different measure of consideration may be extended to a bondholder who was the good-faith holder of the obligation before the litigation commenced from that shown to a mere speculator who after the property has passed under the control of the court, buys an interest in what may be saved out of the wreck, the following cases may be cited, Guaranty Trust Co. v. Chicago, Milwaukee, & St. Paul Railway Co. (D.C.) 15 F.(2d) 434; Palmer v. Bankers' Trust Co. (C.C.A.) 12 F.(2d) 747.

The case of Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555; 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106, cited by appellants, is not in point. Issues like these here were not involved. In that case, speaking of the Bankruptcy Act, the court remarked, 295 U.S. 555, at page 589, 55 S. Ct. 854, 863: "But the effect of the act here complained of is not the discharge of

Radford's personal obligation. It is the taking of substantive rights in specific property acquired by the bank prior to the act. In order to determine whether rights of that nature have been taken, we must ascertain what the mortgagee's rights [that is the suitor's rights] were before the passage of the act." That case, as other cases cited by appellants, and the majority opinion as well, are based on a legitimate claim.

The able briefs and argument of counsel for appellants rest primarily upon the position that appellants were free from inequitable conduct in acquiring the bonds which is contrary to the findings of the District Court.

Thus the basic issue in this suit is ignored and the fraudulent acquisition of this claim by appellants after the inauguration of the bankruptcy proceedings for the purpose of defeating the processes of the court, damaging the debtor, and harming the general unsecured creditors, is lost sight of and disregarded.

The controversy between the parties is narrowed to the question: Is there in the record sufficient evidence of collusion, unfair dealing, inequitable conduct, or fraud upon the part of appellants, to support the findings of the District Court? In my opinion there is, and therefore the decree should be affirmed.