## In re CONSOLIDATED ROCK PRODUCTS CO. et al.

## DU BOIS v. CONSOLIDATED ROCK PRODUCTS CO. et al.

### No. 9000.

Circuit Court of Appeals, Ninth Circuit.

June 19, 1940.

As Modified on Denial of Rehearing
Aug. 5, 1940.

Writ of Certiorari Granted Oct. 28, 1940.

See 61 S.Ct. 71, 85 L.Ed. ——.

Mott & Grant, John G. Mott, Kenneth E. Grant, and Howard A. Grant, all of Los Angeles, Cal., for appellant.

H. W. O'Melveny, Walter K. Tuller, Louis W. Myers, Homer I. Mitchell, and Graham L. Sterling, Jr., all of Los Angeles, Cal., for appellees Badgley, Col. Frith, Knight, Taylor, and others.

Gibson, Dunn & Crutcher, J. C. Macfarland, Thomas H. Joyce, and Frederic H. Sturdy, all of Los Angeles, Cal., for appellees Courtright, Dreher, Gay, Ginoux, Witter, and others.

Latham & Watkins and Paul R. Watkins, all of Los Angeles, Cal., for appellee Consolidated Rock Products Co.

Stanley M. Arndt, of Los Angeles, Cal., for appellees Hatch & Van Gelder, and others.

Edgar Shook, of Kansas City, Mo., amicus curiae.

Chester T. Lane, Gen. Counsel, Martin Riger, George Rosier, and Irving S. Rogers, Attys., Securities and Exchange Commission, all of Washington, D. C., amicus curiae.

Before GARRECHT, HANEY, and STEPHENS, Circuit Judges.

HANEY, Circuit Judge.

An objecting bondholder has appealed from an. order confirming a plan of reorganization under § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207.

In the year 1929, Union Rock Company, hereinafter called Union, Consumers Rock & Gravel Company, Inc., hereinafter called Consumers, and Reliance Rock Company, hereinafter called Reliance, all of which were Delaware corporations, were engaged in the business of mining, processing, shipping and selling rock, sand and gravel. Prior to, or about the time of what the parties call the "consolidation" hereinafter mentioned, Union acquired all the outstanding stock of Reliance. These three corporations carried on about 75% of all the rock, sand and gravel business carried on in Southern California.

Both Union and Consumers had 6% first mortgage bonds outstanding. The acreage of the properties owned by each are shown as follows:

| | Fee | Lease | Total |
|---|---|---|---|
| Union and subsidiaries | 2121.10 | 470.75 | 2491.55 |
| Consumers | 321.32 | 919.84 | 1241.16 |

In 1928, independent appraisers appraised the properties of Union and Consumers at approximately $15,000,000. The record does not disclose how these values were allocated between Union and Consumers. Balance statements made on March 31, 1929, show values of fixed assets as follows:

| | |
|---|---|
| Union | $ 6,644,868.99 |
| Reliance | 1,533,389.60 |
| Consumers | 4,988,134.66 |
| | $13,166,393.16 |

At the same time the amount of bonds outstanding in the hands of the public was as follows:

| | |
|---|---|
| Union | $2,388,000.00 |
| Consumers | 1,492,000.00 |

The consolidation referred to was accomplished by organization of a Delaware corporation, Consolidated Rock Products Company, hereinafter called the debtor, with no par preferred stock, having a liquidation preference of $25 per share and a dividend rate of $1.75 per share, and no par common stock, which stock was either exchanged for the stock in Union and Consumers, or sold and part of the proceeds thereof used to acquire stock in Union and Consumers. Some of the proceeds of the sale were used to purchase operating equipment. Debtor then made an agreement by which it became entitled to operate directly the properties of Union and Consumers, and was required to meet payments of principal and interest on the bonds.

In 1931 a revaluation of the properties was made by officers of the debtor, who fixed the value of all properties at $4,414,-425. The record does not disclose how those values were allocated between the corporations.

On February 16, 1933 an agreement was executed purporting to be a modification of the operating agreement. The operating agreement required the debtor to make allowance for depreciation, depletion and obsolescence but did not prescribe the value basis to be used. The accountants had used the then book value as a basis. The modification provided for an "actual value" basis, to be obtained yearly by a Board of Appraisers. Default in the payment of the interest due on the Union bonds occurred on March 1, 1934. A similar default occurred with respect to the Consumers bonds on July 1, 1934. There were defaults also in required retirements.

Appellant acquired Union bonds having a maturity value of $150,000 after default thereon had occurred. Of that amount he acquired $72,000 of bonds prior to the date upon which debtor's petition under § 77B was filed, and $78,000 of such bonds after such date. He also acquired $31,500 of Consumers bonds after default thereon but before the filing of proceedings under § 77B. He testified that he purchased the bonds after careful inquiry and with the full belief and conviction that a building "boom" would soon occur, and that he did not purchase them for purposes of speculating or market fluctuations. The $181,500 of bonds were purchased by appellant for $28,300.

On May 24, 1935, the debtor, Union and Consumers filed petition to reorganize under § 77B of the Bankruptcy Act. On April 28, 1937 the petition submitting the plan of reorganization was filed. Appellant filed objections, and asked that the various properties be impartially appraised, and that an independent auditor be appointed to report the indebtedness. On September 30, 1937 the amount of principal and interest due on bonds held by the public was:

|  | Principal | Interest |
|---|---|---|
| Union | $1,877,000 | $459,865 |
| Consumers | 1,137,000 | 255,825 |
|  | $3,014,000 | $715,690 |

About this time the debtor's books showed that it owed Union and Consumers about $5,000,000, the validity and amount of such debt being disputed by the debtor.

The plan of reorganization contemplated: Organization of a new corporation; transfer to it of all Union properties (including those of its subsidiaries), Consumers' and debtor's properties free of any claims; issuance by the new corporation of a mortgage covering all the properties as security for $1,507,000 in 5% bonds payable from income only, and divided into two series; Series U bonds in the amount of $938,500 were to go to Union bondholders; Series C bonds in the amount of $568,500 were to go to Consumers bondholders; issuance by the new corporation of 30,140 5% preferred stock having a par value of $50,000, in two series; 18,770 shares of Series U preferred stock was to be issued to Union bondholders, and 11,370 shares of Series C preferred stock was to be issued to Consumers bondholders; issuance by the new corporation of 425,718 shares of common stock having a par value of $2 per share, as follows: 285,947 shares to debtor's preferred stockholders; 37,540 shares to be reserved for issuance upon the exercise of stock purchase warrants to be attached to Series U preferred stock; 22,740 shares to be reserved for issuance upon exercise of stock purchase warrants to be attached to Series C preferred stock; 79,491 shares to be reserved for issuance upon the exercise of stock purchase warrants to be issued to the debtor's common stockholders. The net income was to be divided into equal parts; one part was to be applied: to interest on Series U bonds, then to sinking fund for retirement of Series U bonds, then to

dividends on preferred stock, then to a sinking fund for retirement of Series U preferred stock after Series U bonds were retired. The other part of the net income was to be applied in the same manner and order on the Series C bonds and preferred stock. The plan also apparently provides for cancellation of the interest due on Union and Consumers bonds, and of any indebtedness owing Union and Consumers by the debtor, although it is not clear where the record so shows.

Under a plan, the holder of a $1,000 Union bond was to receive: (1) a Series U bond of the new corporation in the amount of $500; (2) 10 shares (having a total par value of $500) of Series U preferred stock of the new corporation; and (3) a stock purchase warrant entitling the holder to purchase 20 shares of common stock of the new corporation at any time within five years at stipulated prices varying from $2 to $6 per share, depending on the time of exercise. The holder of a $1,000 Consumers bond obtained the same treatment except that he received Series C bonds and preferred stock.

At the hearing valuations of the properties were given by Mitchell, who was vice president and secretary of the debtor, secretary of Union and secretary of Consumers, by Rogers who had been employed by Union for many years prior to the consolidation, and by Gautier, an executive officer of the debtor. The valuations of the properties of Union (including Reliance), and Consumers so given were:

| Witness | Union | Consumers |
|---|---|---|
| Mitchell | $2,150,200 | $1,267,100 |
| Rogers | 2,518,000 | 750,000 |
| Gautier | 1,940,000 | 1,436,000 |
| Average | 2,202,733 | 1,151,033 |

Taking the average of these valuations, the following shows a comparison with the amount of principal and interest due on the bonds:

| Union | | Consumers | |
|---|---|---|---|
| Valuation | Bond Pr. & Int. | Valuation | Bond Pr. & Int. |
| $2,202,733 | $2,336,865 | $1,151,033 | $1,392,825 |

The parties seem to assume that the properties are valuable enough to pay the bonds in full, and it may be they are considering only the principal. From the above valuation, it can be seen that both principal and interest now due would be amply secured only if the debtor is indebted to Union and Consumers.

The special master to whom the cause had been referred found that the assets of Union, Consumers, Reliance and the debtor "are entirely insufficient and inadequate to pay the face value of the bonds, plus all accrued interest and the liquidation preferences, plus accrued dividends upon the preferred stock of" the debtor; that the value of the assets, admittedly subject to the trust indentures, "is insufficient to pay the par value of the bonds, plus accrued interest"; that "the fair present going-concern value of all of the properties, if operated as a unit, is in excess of the total bonded indebtedness plus accrued and unpaid interest thereon up to April 1, 1937, the latter being the date of the new bonds to be issued under the plan of reorganization". He further found that it was to the bondholder's interest to operate the properties as a unit because by such operation they would receive a larger yield and return both as to principal and interest on the bonds, and recommended approval of the plan of reorganization.

The trial court found that the properties of Union, Consumers and Reliance had been commingled and that it was impossible to segregate "with any degree of accuracy of fairness properties which originally belonged to the companies separately"; and confirmed the findings of the special master with respect to values stated above. The court approved the plan as fair and equitable and from the order to that effect, appellant appeals.

On November 4, 1939, a majority of this court, one judge dissenting, affirmed the order. Two days thereafter and on November 6, 1939, Case v. Los Angeles Lumber Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110, was decided. On February 19, 1940, we granted appellant's petition for a rehearing, vacated the decree entered pursuant to our opinion, withdrew the opinion, and directed the parties to file briefs regarding the applicability and effect of Case v. Los Angeles Lumber Co., supra, on the instant case. The Securities and Exchange Commission sought and was granted leave to file a brief as amicus curiæ. In addition, one Edgar Shook sought and was granted leave to file a brief as amicus curiae. Shook is interested in a similar reorganization plan for an unrelated cor-

poration, the proceedings being in the jurisdiction of a Kansas court.

The debtor, preferred stockholders' committee, the bondholders' protective committee, and amicus curiae Shook, have filed briefs in support of the plan of reorganization, and all will hereafter be referred to as appellees without identification. Appellant and amicus curiae, Securities and Exchange Commission have filed briefs opposing the plan and will hereafter be referred to as appellants without identification.

Before discussing the various contentions in detail, it should be remembered that Union bondholders had a first and prior claim on Union's assets, which included stock of Reliance, as well as a portion of the claim for $5,000,000 against the debtor, if valid. Likewise Consumers bondholders had a first and prior claim against Consumers' assets, which included a portion of the claim for $5,000,000 against the debtor, if valid. If the claim mentioned was valid then both groups of bondholders through Union and Consumers would have in addition a claim against any assets owned by the debtor prior to any claim of debtor's preferred stockholders, to the extent of the liability. It can be seen, therefore, that until the claim is settled, either voluntarily or by litigation, there is no way to determine the fairness of any plan of reorganization, because until it is known what assets are subject to payment of the bonds, we have no way of knowing what the bondholders will lose, if anything.

Likewise, the lack of findings as to the precise value of assets covered by the trust indentures, the value of assets not covered by such indentures but subject to the bonded indebtedness, and the value of assets free of any claims of the bondholders, seriously hampers any judgment on the matter. In this respect, the findings are inconsistent. It has been found that the assets have been so commingled that identification thereof is impossible, yet findings are made to the effect that assets subject to the trust indentures are insufficient to pay the principal of and interest on the bonds. However, since the plan proposed, we think, is unfair as a matter of law for reasons hereafter stated, we assume that both matters mentioned will be satisfactorily disposed of upon remand of the cause.

In Case v. Los Angeles Lumber Co., supra, the debtor owed bondholders and had two classes of stock outstanding, both having equal voting power. Class A stock had been issued in return for a contribution of $400,000, and Class B stock had been issued in payment of unpaid interest on bonds. Bonds outstanding amounted to $3,807,071.88 including interest. There were outstanding 57,788 shares of Class A stock and 5,112 shares of Class B stock. The debtor was insolvent "both in the equity and in the bankruptcy sense". 308 U.S. at page 109, 60 S.Ct. at page 4, 84 L. Ed. 110. The plan of reorganization contemplated the formation of a new corporation with preferred and common stock having a par value of $1 per share. The bondholders were to receive 641,375 shares of a total of 811,375 shares of preferred stock, for their claims as bondholders. The remaining preferred stock was to be sold for cash. Class A stockholders were to receive all the new common stock consisting of 188,625 shares. No provision was made for Class B stock. Holders of 92.81% of the face amount of the bonds, 99.75% of the Class A stock, and 90% of the Class B stock approved the plan.

The plan was held unfair as a matter of law because, while the bondholders were entitled to all the assets, the plan required them "to surrender to the stockholders 23 per cent of the value of the enterprise". 308 U.S. at page 119, 60 S.Ct. at age 9, 84 L.Ed. 110. The court said, however, that a stockholder could participate in a plan of reorganization of an insolvent debtor, but that in such case, in order to accord the creditor his full right of priority against the corporate assets "the stockholder's participation must be based on a contribution in money or in money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder". Here we are interested in the first point mentioned.

Section 77B, sub. f requires a plan of reorganization to be "fair and equitable" among other things. The court held that the words "fair and equitable" were used in § 77B in the same sense and had the same meaning as they had "in the field of equity receivership reorganizations"; that in such reorganizations, the words "fair and equitable" included "the rules of law enunciated by this Court in the familiar cases of Railroad Co. v. Howard, 7 Wall. 392, 19 L.Ed. 117; Louisville Trust Co. v. Louisville, N. A. & C. Ry. Co., 174 U.S. 674, 19 S.Ct. 827, 43 L.Ed. 1130; Northern Pacific Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931; Kansas City Terminal Ry. Co. v.

Central Union Trust Co., 271 U.S. 445, 46 S.Ct. 549, 70 L.Ed. 1028."

■■■ It is unnecessary to discuss fully the cases cited, because they are fully discussed in Case v. Los Angeles Lumber Co., supra. It is enough to say that the latter case, with respect to full priority, holds that: a stockholder's interest in corporate property is subordinate, first, to the rights of secured creditors, and, second, to the rights of unsecured creditors (308 U.S. at page 116, 60 S.Ct. at page 1, 84 L.Ed. 110); that creditors are entitled to be paid from the property before the stockholders can retain it for any purpose whatever (308 U.S. at page 116, 60 S.Ct. at page 1, 84 L. Ed. 110); that such right of the creditors to priority over stockholders extends to "all the property" of the debtor, and to "the full value" thereof (308 U.S. at page 120, 60 S.Ct. at pages 9, 10, 84 L.Ed. 110); and that any plan "by which the subordinate rights and interests of the stockholders are attempted to be secured at the expense of the prior rights of either class of creditors comes within judicial denunciation". 308 U.S. at page 116, 60 S.Ct. at page 7, 84 L. Ed. 110.

■ It is obvious that the plan here is condemned by these rules. The trial court found that the property of Union covered by the trust indenture was insufficient to pay the principal and accrued interest of the bonds issued by Union, yet the Union bondholders are deprived of their right to full priority against Union's assets, since Consumers' bondholders and debtor's preferred stockholders are given an interest in Union's property. Likewise, the trial court found that the property of Consumers covered by the trust indenture was insufficient to pay the principal and accrued interest of the bonds issued by Consumers, yet Consumers' bondholders are deprived of their right to full priority against Consumers' assets, since Union bondholders and debtor's preferred stockholders are given an interest in Consumers' property. Exactly in point, as to facts, is Case v. Los Angeles Lumber Co., supra. Since the order must be reversed on the ground that the bondholders have not been accorded full priority, it is unnecessary to discuss other charges of unfairness in the plan, some of which appear to be sound.

■ Appellees attempt to distinguish Case v. Los Angeles Lumber Co., supra, on the ground that there the debtor was insolvent, whereas here the debtor is solvent. Assuming, without so deciding because of the state of the record as mentioned, that the debtor here is solvent, we think the distinction is without merit. Several reasons compel that conclusion, the most important being that a corporation may come within the terms of § 77B although it is not insolvent, but "unable to meet its debts as they mature". Continental Illinois Nat. Bank v. Rock Island Ry., 294 U.S. 648, 672, 55 S.Ct. 595, 604, 79 L.Ed. 1110. The statute requires a proposed plan to be "fair and equitable" regardless of the condition of the corporation, whether it be solvent or insolvent. The statute does not limit the test, "fair and equitable", to plans of reorganization of insolvent corporations, but lays down the requirement that a plan must be "fair and equitable" for all corporations seeking relief under § 77B. We think a proposed plan of reorganization under § 77B must be "fair and equitable", whether the corporation sought to be reorganized is solvent or insolvent.

Some suggestion is made that because Du Bois paid only a small amount of money for his bonds, we should approve the plan. We cannot accede to that view, first, because the court must of necessity give "an informed, independent judgment" as to the fairness of the plan (Case v. Los Angeles Lumber Co., supra, 308 U.S. at page 115, 60 S.Ct. at page 1, 84 L.Ed. 110), and because whatever Du Bois paid is immaterial to a consideration of the real question— Is the plan fair and equitable? Security-First Nat. Bank v. Rindge Land & Navigation Co., 9 Cir., 85 F.2d 557, 561, 107 A.L.R. 1240; Wade v. Chicago, Springfield etc. Railroad, 149 U.S. 327, 343, 13 S.Ct. 892, 37 L.Ed. 755.

■ Considerable argument is made to the effect that the debtor's preferred stockholders are "forgotten men"; that they lose 96% of their investment; and that they have an equity and must be given an interest in any plan of reorganization. We are not impressed by this argument. When a person buys a bond, he obtains it on the theory that he is not an owner but a creditor. When a person buys stock, common or preferred, he knows that he is buying an interest in the corporation which is subordinate to claims of the corporate creditors. He runs the risk of having an interest in something that is valueless.

■ As to whether the preferred stockholders are required to be recognized in a

plan of reorganization, the question depends on whether they have an equity. If they do not, then their participation "must be based on a contribution in money or in money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder". Case v. Los Angeles Lumber Co., supra, 308 U.S. at ·'ge 122, 60 S.Ct. at page 10, 84 L.Ed. 110. On the other hand, if the preferred stockholders have an equity after satisfaction of creditors, then they should be considered in the plan of reorganization. Taylor v. Standard Gas Co., 306 U.S. 307, 323, 59 S. Ct. 543, 83 L.Ed. 669. Under the incomplete findings presented here, we have no way of knowing how much, if any, equity the preferred stockholders have, so it is unnecessary to consider what limitations, if any, control the award of an interest to preferred stockholders in the event that they might have an equity.

It is also urged that the bondholders, under the proposed plan, are superior in every way to the preferred stockholders. While "relative priorities of the bondholders" and the preferred stockholders may be accorded, such "relative" priority is clearly insufficient. Case v. Los Angeles Lumber Co., supra, 308 U.S. at pages 119, 120, 60 S.Ct. at page 1, 84 L.Ed. 110. It is further said that the plan must be held to be fair because it achieves, by one step, results which could be achieved under California law by several steps. Such fact, if it be a fact, is immaterial. This proceeding is pending under the federal law and must meet the requirements of that law.

Finally, appellants urge that the trial court should be directed to cause an appraisal of the property to be made, because consideration of values "was not fully supported by adequate underlying data, especially as concerns earning power" and because more than three years have elapsed since the question of values was considered. While we agree that the "values" of the various properties are necessary to a complete determination as to the fairness of any plan, and that a "fresh examination into such question" should be made, no arguments are made on the question as to whether we have power to direct an appraisal. Under these circumstances we think we should leave the question open and, while expressing the opinion that an appraisal should be made, merely say that precise findings as to values must be made.

Reversed.